## MORSE v. MONTANA ORE-PURCHASING CO.

(Circuit Court, D. Montana. December 10, 1900.)

### No. 531.

1. NEW TRIAL—DISQUALIFICATION OF JUROR—WAIVER OF OBJECTION.

A new trial will not be granted because of the disqualification of a juror who was not challenged or examined as to his qualification, although the failure to examine was due to a mistake of fact not induced by the juror or the adverse party.

2. SAME—MISCONDUCT OR BIAS OF JURORS—SUFFICIENCY OF PROOF.

Proof of misconduct on the part of jurors during a trial, or of statements made by jurors showing their bias or prejudice, alleged as grounds for a new trial, must be sufficient to overcome the denials of such allegations by the jurors affected, and to sustain the burden of proof which rests upon the party making them.

3. SAME—EVIDENCE—TESTIMONY OF JURORS.

On a motion for a new trial on the ground that jurors were prejudiced by newspaper articles published during the course of the trial, the testimony of a juror is admissible on the question whether or not he read any such articles, but not as to whether, or to what extent, he was influenced thereby.

4. SAME—PREJUDICE OF JURORS—NEWSPAPER PUBLICATIONS.

Where a trial lasted a greater part of two months, during which a leading newspaper of the city in which it was held, and where nearly all of the jurors resided, continued to publish articles apparently intended to influence the determination of the case, and calculated strongly to prejudice public sentiment against one of the parties, and to present the other in a most favorable light, some of which articles were admittedly read by some of the jurors, such facts afford ground for a new trial on behalf of the party against whom the articles were directed, without regard to the question by whom such articles were instigated.

5. SAME—WAIVER OF OBJECTION.

A party is not precluded from assigning the prejudice of jurors by newspaper articles published during the trial of a cause as a ground for new trial, because he failed to have the publishers cited into court for contempt, where the power of the court to punish for contempt on account of such publications was doubtful, nor because he did not ask a continuance on the ground of the publications.

On Motion for New Trial.

John F. Forbis, William Scallon, T. J. Walsh, L. O. Evans, Henry G. McIntire, Wilbur F. Sanders, and William Wallace, Jr., for plaintiff.

Cullen, Day & Cullen, F. E. Corbett, John B. Clayberg, John W. Cotter, Arthur P. Heinze, Elbert D. Weed, Robert B. Smith, and John J. McHatton, for defendant.

KNOWLES, District Judge. The plaintiff in this case has petitioned the court for a new trial. As grounds therefor, many alleged reasons are presented. In the argument made in support of the petition only a few of the reasons or grounds for granting the same were urged. The following were presented in the brief of counsel for plaintiff:

1. That the juror Passavant was disqualified for the reason that his name did not appear as a taxpayer on the assessment roll of Lewis and Clarke county, Mont., for the year 1899; that being the county of his residence. The plaintiff failed to interrogate this

juror upon that point, and made no challenge to him as a juror on that ground. Plaintiff has presented affidavits showing why he did not examine said juror Passavant as to his qualifications as a juror under the laws of Montana. Indeed, it is stated that they had examined the county records of Lewis and Clarke county, and found upon the assessment roll of the preceding year the name W. A. Passavant, and supposed that this was the name of the above-named juror. The general rule is that, if a party fails to challenge a disqualified juror, he waives all objections to the same. It is very easy for a party to interrogate a juror as to his qualifications, and because he has failed to do so upon a mistake of fact, not induced by the juror or the opposing party, he should not be entitled to a new trial, especially when the trial has been a long and expensive one, and where the party does not show, as in this case, that he would have challenged said juror had he known the fact concerning his disqualification. The fact that the juror was anxious that it should appear that he was a taxpayer in the county where he lived, in order that he might serve as a juror, is not sufficient ground of itself for a new trial. It has been often found that persons were anxious to become jurors for no other purpose than that of finding employment.

2. The second ground that I will consider is that it appears from the affidavit of one Tibbitts that the juror Farris made declarations before the cause was finally submitted to the jury showing that he was biased, and had been influenced by the publication in the Helena Independent newspaper of an article in regard to the result of a trial had in Judge Clancy's court in Silverbow county. The said affidavit details the conversation had with said juror in regard to said case, and its effect upon the case on trial in which he was a juror. Mr. Farris, in an affidavit, positively denies this conversation. The burden of proof as to the same was upon the plaintiff, and I am not willing to hold that he has established it.

3. The third ground presented is in regard to the furnishing of refreshments to the jurors in the cause. The affidavit of J. P. McCabe states that on the evening of the 24th of December, 1899, and during the trial of the cause, one Sam McMurran, an employé of the defendant, and the juror E. C. Perrett entered the Chamber of Commerce Saloon, in Helena, drank together at the bar, and entered into a conversation in a low tone of voice for some 15 minutes. This is positively denied in the affidavit of both McMurran and Perrett, and the statements contained in the affidavits of McMurran and Perrett are corroborated by the affidavit of O. B. Totten, the father-in-law of said Perrett, in this: He states that Perrett was at home at his house during all of the evening of said December 24th. In the affidavit of J. M. Hannigan it is stated that he was a barkeeper in the saloon of T. J. Cronin, in Helena, and that on the 24th day of December, 1899, said McMurran and the juror Perrett came into said saloon and drank together. There is some evidence as to a talk between Hannigan and McMurran about the matter of tampering with the jury. This is also denied in affidavits made by said Perrett and McMurran. There are also affidavits presented stating

that the reputation of the said McCabe for truth, honesty, and integrity, in the community where he resides, is bad. An affidavit is also filed attacking the reputation of the said Hannigan for truth, honesty, and integrity, made by one W. H. Orr. As the burden is on the plaintiff to establish these facts, I do not think the court could find them to be true.

4. It is also alleged that the juror Joseph N. Kenck received refreshments at the hands of McMurran and Crabtree, employés of the defendant. O. A. Kenck, a cousin of said juror, in an affidavit, states that his cousin, the juror, told him that during the progress of the trial of this cause one McMurran and one Crabtree, whom he knew to be employés of the defendant, had furnished him with money to play at nickel in the slot machines, and had also furnished him with drinks and cigars whenever he wanted them, and that he would even call on them from across the street when he wanted either drinks or cigars. The juror Kenck denies this statement, and also the fact of having such a conversation, and McMurran and Crabtree deny that any such occurrence took place. The fact, however, of the juror Kenck taking a nickel and playing it in another nickel in the slot machine, and of taking a cigar from McMurran, is admitted. The manner in which this was done indicates a considerable intimacy between said juror and McMurran. The juror, however, denies that he knew that McMurran and Crabtree were in the employ of the defendant. There is also a reported conversation between this juror and said McCabe, spoken of above. This conversation, if true, as reported, exhibited a corrupt state of mind on the part of said juror. The court, however, must consider, not what the juror Kenck said, but what he did, and the only fact established is the taking of the cigar and the playing of the nickel above referred to; and considering the fact that McMurran and Crabtree were in the employ of the defendant, and were in Helena during the trial of the cause, the matter presents a ground for suspicion, but would scarcely be enough by itself to overturn the verdict in the case.

5. The next ground for a new trial is the publication of a number of articles in the Helena Independent, a newspaper published in the town of Helena, having a tendency to prejudice the minds of the jurors against the plaintiff, or the party represented by him. In the issue of said newspaper under date of December 12th, 1899, referring to the trial of this cause, appears the following:

"The trial of the contention between what was indicated by the examination of the talesmen for the cause in court yesterday to be the Amalgamated Copper Company, on one side of the action (E. Rollins Morse, as trustee, being the nominal plaintiff), and the Montana Ore-Purchasing Company, on the other, over the ownership of valuable ore bodies in Butte, was begun yesterday in the United States court."

In the deposition of G. W. Sykes, the leading editor of the Independent, he was asked why he used the term "Amalgamated Copper Company versus Montana Ore-Purchasing Company" in the description of the cause on trial, and he replied:

"I can answer for myself, of course. That being my understanding that the Amalgamated Copper Company owned the property of the Boston &

Montana Company, the Butte & Boston Company, as well as the Anaconda; that they were all allied interests under the general name of the Amalgamated Copper Company."

And also to another question his reply was:

"Because very few of the people would know who E. Rollins Morse was, and who he represented, unless we explained it time and time again; and, in a general way, all our readers know what the Amalgamated Copper Company is."

This does give a clew as to whom and as to what was intended by the following articles published from time to time in said paper while this cause was on trial in this court.

In the issue of December 16, 1899, in a leading editorial, it is stated that certain parties, by means of the Amalgamated Copper Company, had swindled Eastern investors out of some $15,000,000, and that such parties will not recommend Montana as a place for the legitimate investment of honest capital, on account of this. In the issue of December 20, 1899, in a leading editorial entitled, "Their Blighting Methods," after abusing Marcus Daly, the president of the Amalgamated Copper Company, it is stated:

"He has of late undertaken to swindle confiding thousands of investors out of their honestly earned savings by manipulating the market for copper stocks, to his own profit and the ruin of scores. The Anaconda and Standard Oil gang, with Daly at their head, forced a consolidation of the properties of that company, the Boston & Montana, the Butte & Boston, the Parrot, and others, for purely stock-jobbing purposes, on the strength of previously honorable records of these companies. All over the East and the West and in Europe there were thousands of people with small savings who invested them in the stocks of the Amalgamated trust, and the stocks of other companies now composing the trust. By crafty manipulation these stocks were all boomed until the money of these small investors was in the pockets of the Daly and Standard Oil coterie. Then the bottom was knocked out, and the confiding investors are cursing the day they first heard the word 'Montana.' They were swindled outright, tens of thousands of them. * * * Furthermore, there are in the hills of Montana hundreds, perhaps thousands, of miners who have been squeezed out of their prospects by the rapacious Daly-Standard Oil outfit, by resorting to costly litigation, by terrorizing, by coercion, by trickery, by some of the various resources the rich are able to employ against the poor. As reckless and cruel a band of speculating pirates is now in control of the properties and their stocks of the Anaconda, the Boston & Montana, the Butte & Boston, and the Parrot as ever scuttled a ship or cut a throat."

In the issue of December 21, 1899, in an editorial entitled, "The Boston Financial Troubles," after referring to the business panic in Boston, and that the same was influenced by a shrinkage in the value of copper stocks, it goes on to say:

"On the strength of the operations of the past these same New Englanders bought Amalgamated stock, and the stocks of the Boston & Montana, the Butte & Boston, and the Parrot, when they were high, on the strength of positive representations that the stock was not held at fictitious value, but was a safe investment; but the unscrupulous manipulators of the Daly-Standard Oil combination had not been reckoned with. This malignant force—a force absolutely dominant in the copper stock market—now found it could make more money working the investors than it could working the mines, and the latter business was exceedingly profitable at that. The result is that the investors were thrown down the deep shaft of fallen quotations, and ruined as completely as if they had been thrown down the deep shafts of the

very mines. * * * Poor investors, with the savings of their lives tied up in copper stocks, will be squeezed into the poor houses, if necessary, that the gang who have already discredited Montana in the eyes of the honest portion of the world may make money, money, money, out of the transaction."

In the issue of December 22, 1899, in an editorial entitled, "Anaconda Coils Tighten on Butte," it is said:

"That the Amalgamated Copper Company is but an enlarged Anaconda is being demonstrated daily since the absorption of the Boston & Montana, the Butte & Boston, and the Parrot Companies into one corporation with the Anaconda. All the baneful and blighting methods of the latter concern have become features in the management of the others. Daly, re-enforced by the Standard Oil forces for evil, is as insatiable as he is unscrupulous and merciless, and the coils of the deadly snake are twining around Butte and other cities in a fearful manner. * * *"

Then, after giving an account of an incident in which it is claimed Mr. Hyams sought to coerce some insurance companies, it is said:

"The incident is not the only one of the kind that has come to notice, but it is the most shameful one of the last few weeks. It serves to show the depths of the tyranny the aggregated Daly forces are exerting in Butte, Anaconda, Great Falls, Missoula, and everywhere else in the state where these concerns have business relations. Anaconda methods, damnable and rotten clear through, are effective in the management of the Boston & Montana, the Butte and Boston, and the Parrot Companies."

In the issue of December 23, 1899, in commenting upon an incident that occurred in court, when Col. Sanders had called the court's attention to an article in the Independent, that paper, in an article entitled, "The Independent and the Courts," said:

"A crew of political cut-throats has been for years—is to-day—sailing around Montana, employing all the tactics of sea pirates to throttle and destroy the liberties and the property of all who do not bow the knee in abject servility to them and give tribute to their rapacity."

In its issue of December 29, 1899, the Independent prints a special dispatch from Butte, with the following headlines:

"Heinze Wins Suit!

"Silverbow county judge decides he is owner of ore claimed by the Amalgamated Company. Has apices in his ground. Ore bodies are continuous from surface to disputed ground. Veins run east and west, and north and south fissure is not a legal vein. Two millions involved. And result makes Heinze a formidable rival of copper trust. Issues same as in trial now pending in Helena."

In this dispatch is the following:

"The decision is the universal talk here to-night, as it makes brighter the future of interests outside of the Amalgamated Copper Company, and guaranties a long life for one competitor. As soon as certain forms of law are complied with, to raise an injunction, 500 more men will be put to work by the Montana Ore-Purchasing Company in this ground, which is already opened for the extraction of ore, but which has been idle nearly three years. * * * The controversy decided here to-day involves the same points as are involved in the suits now on trial before the United States court in Helena between E. Rollins Morse, the representative of the Amalgamated Copper Company, and the Montana Ore-Purchasing Company. The Michael Devitt adjoins the Pennsylvania on the east, and the ground beneath is worked as one mine."

It appears that this dispatch, which is a long one, was sent by Mr. John MacGinniss, the vice president of the Montana Ore-Purchasing Company.

In the issue of December 30, 1899, a comment is made upon the decision rendered by Judge Clancy, and above referred to. A part of the comment is as follows:

"The findings of fact rendered by Judge Clancy in his decision in the suit of the Montana Ore-Purchasing Company against the Amalgamated interests in Butte, for the possession of the ore bodies beneath the surface of the Pennsylvania lode claim, are interesting to mining men, not alone, but to all who have watched the course of proceedings in the big copper camp, and the fight that has been waged there by the Amalgamated Company for its own supremacy, and for the shutting out of the only rival who has seemed to be formidable to it. The effect of the decision is to add to the resources of the rival, and to make people realize that he is a man who proposes to have his rights, and whom the power of even one of the largest trusts in the country cannot destroy. As has already been told in the Independent, the decision will be followed by suits for damages; for during the time of the pendency of the action to determine the ownership of the controverted ore body, worth millions in ore taken out and yet to be hoisted, it will be claimed great damage has been done by the enforcement of the injunctions that have prevented Mr. Heinze and the Montana Ore-Purchasing Company from working what now proves to be theirs. The case is further of exceeding interest because the issues are practically the same in the Michael Devitt suit now pending in court. The Michael Devitt lies east of the Pennsylvania, both are south of the Johnstown and Rarus claims, and the lode which apexes in the latter dips southward, going under the Pennsylvania and Michael Devitt. * * *"

In the issue of December 31, 1899, I find the following:

"Butte, December 29. The Boston & Montana Mining Company to-day brought suit in the district court against the Montana Ore-Purchasing Company to recover $600,000, the value of the ore alleged to have been taken from veins in the Pennsylvania claim by the defendant concern in the last four years. This is looked upon as another phase of the big controversy between the two companies, which was decided in the district court yesterday in favor of the Montana Ore-Purchasing Company."

In commenting upon this dispute the Independent says:

"Is this suit a move in the effort of the Daly-Boston & Montana Department of the Amalgamated Copper Company, a trust, to crush a rival? An impartial observer could hardly reach any other conclusion. According to the dispatches, the suit begun Friday was but another phase of the suit decided against the combination the day before. It doubtless has just enough new features to give it a standing in court, and will be nursed along in the manner calculated to do the defendants the greatest harm. Trial will probably not be risked, as the decision rendered by Judge Clancy on Thursday would indicate the result. Each move of the character of Friday's suit is but another demonstration of the charge that the Amalgamated Copper Company, a trust, of which the Anaconda and Boston & Montana Companies are components, has planned to subdue the whole state of Montana, and that its first move in the extermination of rivals has been made in Butte."

In the issue of the 3d day of January, 1900, is the following:

"The Independent has received a letter from a well-known business man of this city, who has been in New York during the recent squeeze in copper stocks which resulted in a couple of broken banks in Boston, and the raiding of Boston & Montana, Butte & Boston, and Parrot stocks by the Standard Oil capitalists who are in the Amalgamated Copper Trust. Our correspondent declares the facts have not been overdrawn; that the squeeze compelled Bigelow, Clark, and other heavy owners of Boston & Montana to accept $200 for stock quoted at $385 but a few weeks before. The Standard Oil people got what they wanted of Boston & Montana stock, and are now in control of everything in Butte except the properties of W. A. Clark and

the Heinzes. Heinze will be the next to get the attention of the Standard Oil monopolists, adds our correspondent. * * *"

In the issue of the Independent of January 8, 1900, is a long article upon Marcus Daly and the Anaconda Copper properties; the headlines of said article are as follows:

### Marcus Took a Big Contract!

"Agreed to end the litigation over Butte Mines and run politics of Montana. So copper trust made him manager. Amalgamated schemers were anxious to secure everything, and something more, perhaps. It was a grand idea, but the proverbial slip 'twixt the cup and the lip came."

In this article is the following:

"In these days one hears in Wall street, on every hand, the expression that it is a fortunate thing that none of Clark's properties or those of the Montana Ore-Purchasing Company are capitalized and listed on the stock exchange or traded in on the curb. Both Clark and F. A. Heinze, the principal owners of the Montana Ore-Purchasing Company, own their properties as undivided or as close corporations. They cannot be reached through the methods of attack generally credited to the Standard Oil interests, and so aptly illustrated by the crash of the Globe National Bank of Boston, and the sacrifice of the heavy holdings of Boston & Montana stock by A. S. Bigelow and his associates. The Standard Oil Company brooks no rival. But how is it to reach one and bring him to terms if he has no known stock speculations, and has not put his securities on the market? The only other method, apparently, is to fight the matter in the courts, or to show the weight of its influence on the side of adverse litigation. Perhaps this explains, in part, the ruinous litigation involving the title of every mining property in Montana which is now pending in the state and federal courts of the country from New York to San Francisco; and an explanation, also, may be found in the threat to unseat Senator Clark. * * *"

In the issue of January 12, 1900, is an editorial upon Mr. Heinze, and in this it is stated:

"The New York Commercial of December 30, 1899, contains a discussion of the copper situation in this state, in which it prophesies that Mr. Heinze is a coming power in Montana. The Commercial comments approvingly upon an interview with a man familiar with the conditions, who told that newspaper that the copper kings—the Standard Oil people, Daly. Clark. the Lewissohns—should not overlook F. Aug. Heinze."

In the issue of January 13, 1900, in an article headed, "The Story of a Blind Pool," it is said:

"It appears from the unbiased accounts of the venture and its sequel, published in the Eastern newspapers, that between United States Senator Clark, who has refused to enter the pool on any terms, and F. A. Heinze, who has refused $5,000,000 to settle his suits against the trust properties because he believes that they have attempted to defraud him out of a great deal more that was rightfully his, have between them given the trust magnates some bad half hours since they made the mistake of not knowing the kind of men they had to deal with. The efforts to crush Heinze have failed, and the copper manipulators are playing a last card now in endeavoring to blackmail Senator Clark by presuming upon his political ambitions, and through that channel to reach a part of the settlement they have all along hoped to effect."

In that part of the article purporting to come from the New York Journal the following appears:

"Starting with control of the Anaconda mine, and with other investments about which little is known, the company found several problems of vital

importance to solve. One was the Butte Mountain situation. Now that it has obtained control of what properties it needs there, the Amalgamated finds that it has acquired also the enormous lawsuits, known as the 'Heinze Litigation,' which has heavy claims against its properties for alleged encroachments upon the property of the Montana Ore-Purchasing Company. Mr. Heinze has refused an offer of $5,000,000 to settle, and is believed to have placed his figure at $15,000,000. * * *"

In the issue of January 21, 1900, in commenting upon an article taken from the Boston News Bureau, it is stated:

"The News Bureau also gives some interesting data about the personality of the Amalgamated Company, the real party back of E. Rollins Morse, the nominal plaintiff in the suit now on trial in Helena."

In the article itself I find the following:

"A great litigation now being prosecuted by the Boston & Amalgamated Copper Companies over the properties on Butte Mountain begins with the litigation over Mr. Heinze's famous Rarus mine, which is declared to be on the great Anaconda lode, and worth, possibly, $10,000,000."

Then it is stated that Heinze had been sued for $720,000 for ore which it is claimed he has taken through the Rarus from the Boston & Montana Company's Pennsylvania claim and the Butte & Boston Company's Michael Devitt claim. The article then goes on to state that:

"Before Judge Clancy, Mr. Heinze and the Montana Ore-Purchasing Company has won on every point, and it was expected that an appeal would be taken to the supreme court; but, instead of so doing, the plaintiffs have just begun a new suit for $600,000, basing their claim upon some points made in the decision of Judge Clancy."

After describing the mines and the litigation in this case, and the amount of copper he is able to produce, it concludes:

"He has also, we understand, in contemplation the erection of another smelter on the other side of the valley, or at Helena, through which he has hopes of rivaling the great Boston & Montana smelter at Great Falls. * * *"

In the issue of January 22, 1900, there is an article entitled, "Cheering News from Boston," in which I find the following:

"From the Boston News Bureau confirmation is had of the report, freely circulated in this state for months, that Mr. Heinze would build a smelter on one of the desirable sites near Helena. From the mines he owns and controls, Mr. Heinze is now taking out, the Boston News Bureau tells us, 2,000,000 pounds of pure copper a month, and expects soon to increase the output to 40,000,000 a year. To take care of this immense increase, additional smelter facilities will be required, and Mr. Heinze will, no doubt, locate his new works in this vicinity. The efforts of the Standard Oil-Daly gang to crush Mr. Heinze have not abated, though defeated at every turn; and conditions in Butte are becoming more intolerable every day, for which reason Mr. Heinze would not think of erecting larger works in that vicinity. The most available place in the state is right here. The completion of the great dam across the Missouri river, and the successful operation of the fine electric plant there, affording desirable and cheap power for smelting purposes, and the presence of an unlimited supply of coal near by, combine to make this an ideal location for a smelter, such as Mr. Heinze will require for his increased copper production. The information gleaned from the Boston News Bureau, which is a recognized authority upon the subject of copper mining and smelting, is good news for Helena."

These excerpts represent but a limited portion of the editorials and articles from which they were taken. They are, perhaps, the most pointed and objectionable portions of the same. Taken all together, the editorials and articles were well calculated to arouse prejudice against the plaintiff in this cause,—not to him personally, but as a representative of the Amalgamated Copper Company and some of the owners of stock in the same; and they were intended to present the defendant and its president, F. A. Heinze, in a most favorable light. It is represented that said Heinze is fighting a most unequal battle against large, dominating, and tyrannical corporations; that he has been offered $5,000,000 to settle his disputes with them, and this he refused, claiming that he has been defrauded out of a much larger sum. It was further stated that he was about to erect large smelting works in the neighborhood of Helena, in which place the cause was being tried, and from whose inhabitants a large number of the jurors had been selected. The most of these jurors were property holders and taxpayers in said city. That these articles were written with the view of influencing in some way the determination of this cause is apparent. The publication thereof was commenced very soon after the commencement of the trial of the cause, and appeared in many of the issues of that newspaper until the trial was terminated, when they ceased. The power of the press to create and mold public sentiment is generally recognized, and cannot be doubted. Public and great private enterprises often resort to it for this purpose. The Independent was a leading newspaper at Helena, and possessed a large circulation in the community where nearly all of the jurors in this case resided, pursued their avocations, and conducted their business ventures. It cannot be doubted but that a public sentiment was created favorable to the defendant in this community by these articles, and experience has demonstrated that jurors are influenced much by the views of the community wherein they live. Some of the jurors acknowledge in their affidavits that they read some of these articles, but deny that they were influenced by them, and one states he considered them as advertisements. The fact as to whether or not the jurors read these articles could be established by their affidavits, but as to what influence these articles had upon their action as jurors could not be so established. In the case of Mattox v. U. S., 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917, the supreme court discussed this question. In it the following is quoted with approval from the decision in Woodward v. Leavitt, 107 Mass. 453:

"That, on a motion for a new trial on the ground of bias on the part of one of the jurors, the evidence of jurors as to the motives and influences which affected their deliberations is inadmissible, either to impeach or support their verdict,"—and adds: "But a juryman may testify to any facts bearing upon the question of the existence of any extraneous influence, although not as to how far that influence operated upon his mind."

Under this authority it was not competent for jurors to prove by their affidavits what influence these articles they read had over them, or what motives actuated them in rendering their verdict. It does not appear what articles the jurors read, but any of the

articles from which the above quotations are taken would have had a tendency to influence a juror and make him partial to the defendant.• Some of the jurors, in their affidavits, state that they purposely avoided reading the objectionable articles. How, as to most of them, they could have known that they were objectionable, without reading their headlines, or reading a portion of the articles themselves, it is difficult for the court to apprehend. Take, for instance, the editorial article headed, "Good News for Helena." How could any one have learned that it had a bearing on the case without reading it partially or entirely?

In the case of Meyer v. Cadwalader (C. C.) 49 Fed. 32, where, upon a petition for a new trial, had under consideration, it appeared objectionable articles concerning the case on trial had been published against the plaintiff, the court held that, as the articles were published in leading newspapers and widely circulated, it would be presumed they had been read by the jury, and it was held that this presented a proper ground for a new trial.

It should be noted in connection with this case that the trial lasted for the greater part of two months, and the jury were allowed to separate when not actually in attendance upon the court.

In the case of People v. McCoy, 71 Cal. 395, 12 Pac. 272, it was held:

"That the reading by a juror, during the progress of the trial, of a newspaper containing any matter in connection with the subject-matter of the trial, which would be likely to influence him in the performance of his duty, is sufficient misconduct to warrant a new trial."

In Thompson on Trials (section 2561) it is stated:

"Jurors may be permitted to read the current newspapers, unless such papers contain reports of the trial, or other prejudicial matter in the form of editorial comment or otherwise."

In the case of U. S. v. Reid, 12 How. 361, 13 L. Ed. 1023, cited by the defendant, it is stated that the articles in the newspaper read by the jurors had no tendency to prejudice them. In this case the court holds that the articles above referred to were well calculated to prejudice and influence the jury, and were written and published, undoubtedly, for that purpose.

In the case of People v. Durrant, 116 Cal. 179, 48 Pac. 75, it does not appear that the jury were allowed to separate during the trial, or had any opportunity to read the newspaper comments on that case, and it did not appear that any of them had read any of the newspaper comments thereon. I do not consider that a case in point, and to be followed in this case.

As to whether or not the defendant instigated the publication does not appear, except as to the dispatch stating and commenting upon the decision of Judge Clancy in the case of Montana Ore-Purchasing Company against Boston & Montana. That dispatch, as stated, was sent by the vice president of the defendant. It is not always requisite, however, that any undue influence brought to bear upon a juror should be the act of either party. In the case of Mattox v. U. S., supra, a bailiff in charge of the jury presented to it the damaging

publication. In Hayne on New Trial and Appeal (section 48) it is stated:

"It cannot be doubted that, where attempts to influence jurors are made with the knowledge or acquiescence of a party, they must be considered as made by himself, and necessitate a new trial. The cases, however, go further, and hold that attempts to tamper with a jury, made by the relatives or friends of a party without his knowledge, are causes for setting aside the verdict."

Considering the circumstances of this case, it would be presumed that counsel for the defendant had knowledge of these publications. Their attention had been called to one of them by one of the attorneys for the plaintiff in open court. Any one who read the daily papers of Helena at that time could hardly escape reading them. That they were written or instigated by persons friendly to the defendant, their contents leave no room to doubt. I would go further, and hold, however, that if it can be established that the verdict of a jury was influenced by any one, even though not a party to the suit, or a relative or friend of such party, it ought not to stand. The verdict of a jury should be the result of its unbiased action. When a jury is influenced by such articles as are presented in this case, it is difficult to prove who instigated them. It is claimed, however, that the plaintiff ought to have had the parties publishing these articles brought into court and punished for contempt, or ought to have applied to the court for a continuance of the cause on account of the prejudice created by them, and by a failure so to do waived the right to present this question upon a petition for a new trial. It was extremely doubtful as to the right of plaintiff to ask that the publishers of this newspaper be brought into court and examined upon the charge of contempt. Section 725 of the Revised Statutes provides:

"The said courts shall have power to impose and administer all necessary oaths and to punish by fine or imprisonment, at the discretion of the court, contempts of their authority: provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice; the misbehavior of any of the officers of said courts in their official transactions and the disobedience or resistance by any such officer or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of said courts."

This statute has received an interpretation by the supreme court in the case of Ex parte Bradley, 7 Wall. 364, 19 L. Ed. 214. That court says:

"That this statute in express terms restricts the power of the court to punish, as contempts, misbehavior in the presence of said courts, or so near thereto as to obstruct the administration of justice."

In the case of Ex parte Robinson, 19 Wall. 505, 22 L. Ed. 205, it is stated that this power of a court to punish for contempts is limited to cases where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice, or as to the misbehavior of an officer, or as to resistance of a writ of the court.

The Independent's publishers seemed to have been advised of the limited power of the court in this matter; for, in the publication of that paper made immediately after Col. Sanders had called attention

to its article, it refers to the fact that it had not brought its paper into court, or hawked it in the presence of the court. To require a party to a suit, when a newspaper publishes an article calculated to prejudice the jury and community against him, to apply to the court for a continuance, or to be deemed to have waived all complaint on account of such publication, would require an act which I think no court would impose. It ought not to be that a newspaper could force a party to continue his cause by a scurrilous attack upon him, and one calculated to bias a jury against him. He might never be as fully prepared for trial again as at that term. And what guaranty would he have that the same tactics would not be again resorted to at the next term? The time, perhaps, has arrived when the courts should say that the dominating and powerful public press should not be used to influence judicial proceedings,—to bias its jurors and intimidate its officers.

There was a substantial conflict in the evidence in the case upon the material questions at issue, and hence, on the ground that the verdict was against the evidence, this court cannot set aside the verdict, although it might have come to a different conclusion than that of the jury upon the facts. But, upon the ground that there was undue influence exerted as to the jury by the objectionable publications hereinbefore referred to, the court will grant a new trial. The verdict is set aside, and a new trial is hereby granted.