# STATE OF NORTH DAKOTA v. F. L. GORDON.

## (155 N. W. 59.)

**Newspaper article — publication — public prejudice — county — judicial district — remedy against — motion for — change of venue — continuance.**

1. The remedy against public prejudice existing throughout a county or judicial district, created by the publication of a newspaper article is a motion for a change of venue, and not for a continuance.

**Publication — prejudice — proof of — fair trial — venue — change of.**

2. Proof that prejudice exists, or that a derogatory article has been published in one of the cities of a county, is not proof that a fair trial cannot be had in the county at large, or that such county as a whole is prejudiced, and is not, therefore, sufficient to entitle one to a change of venue.

**Change of venue — public prejudice — excitement — trial — postponement — appellate court.**

3. In order to justify a change of venue on account of the excitement of public prejudice, it must be shown that such excitement or public prejudice is such that its natural tendency will be to intimidate or swerve the jury, and as the court in which the case is pending can much better determine the propriety of a postponement on this ground than the appellate court it requires a very strong showing to induce the upper court to interfere.

**Rulings of trial judge — fair and impartial — prejudice or fear not presumed.**

4. Prejudice or fear on the part of the trial judge on account of the publication of a newspaper article cannot be presumed where the record shows that the rulings of such judge were eminently fair.

**Juryman — qualifications — misstatements published and read by — presumption — evidence — merits of case — trial court.**

5. The mere fact that a newspaper article has been published in relation to

a case under consideration, and contains misstatements, does not itself disqualify a juryman, even though he may have read the same. Newspaper reports are ordinarily regarded as too unreliable to influence a fairminded man when called upon to pass upon the merits of a case in the light of evidence given under oath; and a juror, although he may have formed an opinion from reading such reports, is competent if he states that he is without prejudice and can try the case impartially, according to the evidence, and the court is satisfied that he will do so.

**Trial judge — discretion — abuse of — appellate court — continuance — refusing — verdict — appropriate under evidence.**

6. The appellate court will not hold that a trial judge abused his discretion in refusing a continuance in a criminal case on account of the publication of newspaper articles which it is claimed may have affected the judgment of the jury, where it affirmatively appears from the evidence in the case that the jury could not have honestly or intelligently returned any other verdict than the one which it did return.

**Jury — panel — talesmen — impartial — verdict — appellate court — defendant's privilege — rights — voir dire.**

7. The appellate court will not set aside a verdict of conviction on account of the fact that newspaper articles were published which may have influenced the jurymen, where there is no showing that an impartial panel or impartial talesmen could not have been obtained, or that defendant was denied his privilege of examining the jurymen on the *voir dire*, and of thus showing their prejudice and protecting his rights.

**Intoxicating liquors — unlawfully keeping for sale — charge of — sales — evidence of — tending to prove charge.**

8. Where a person is charged with the offense of unlawfully keeping intoxicating liquor for sale, evidence of sales is admissible as a circumstance tending to prove the crime charged.

**Express company — delivery book — consignments of liquor — receipted for — by defendant — evidence — original bills of lading — not used in evidence — signature of defendant — receipting for liquor.**

9. The delivery book of an express company in which various consignments of liquor were receipted for by the defendant is admissible in evidence in a prosecution for unlawfully keeping intoxicating liquor for sale, and in spite of the fact that the original bills of lading or shipping bills were not introduced, where the signature of such defendant appears in such book as a receipt for such liquor, and is proved to be his.

**Defendant — signature of — criminal action — made at trial — for comparison — proof — admissible — handwriting.**

10. The signature of the defendant in a criminal action, which is made by him in open court and without objection, is admissible in evidence for com-

parison, and in order to prove the genuineness of other handwriting claimed to be his.

**Intoxicating liquor — unlawfully keeping for sale — action — liquor delivered to customers at place described — stored elsewhere — immaterial.**

11. Where in an action for the unlawful keeping for sale of intoxicating liquor as a beverage, proof is made that liquor was on several occasions delivered to customers at the shop of the defendant, it is immaterial that the liquor itself was stored at some other place.

**Intoxicating liquors — large quantities — receiving — evidence of unlawful purpose.**

12. The receipt of large quantities of liquor is at least some evidence of the receipt of such liquor for unlawful purposes.

**Intoxicating liquors — unlawfully keeping for sale — charge of — evidence — express agent — goods delivered by — abbreviations used in books.**

13. No error is committed in a prosecution for the unlawful keeping for sale of intoxicating liquor, in allowing the express agent who delivered the goods to testify as to the meaning of abbreviations in his receipt book, such as "Liq.," "Cs.," and "Bx."

Opinion filed November 8, 1915.

Appeal from the District Court of Williams County, *F. E. Fisk*, J.

Criminal prosecution for the unlawful keeping for sale of intoxicating liquors. Defendant convicted. Defendant appeals.

Affirmed.

*Joseph Cleary*, for appellant.

*Wm. G. Owens*, State's Attorney of Williams County, and *Henry J. Linde*, Attorney General, *Francis J. Murphy*, and *H. R. Bitzing*, Assistant Attorneys General, for respondent.

### Statement of facts.

BRUCE, J. This is an appeal by the defendant from a conviction on the charge of "unlawfully keeping for sale, barter, and gift," intoxicating liquors as a beverage, between the 26th day of June, 1914, and the 31st day of December, 1914.

The information was filed on January 5th, 1915, and during a term of the district court, the preliminary examination being had on January 2d, 1915, at which time the defendant was bound over to the next term of the district court. Prior to the time of the present trial and

32 N. D.—3.

at the same term of court, the defendant had been tried on and acquitted of the charge of having committed the offense of unlawfully selling and giving away intoxicating liquors. It also appears that in the case at bar, very much the same evidence was necessarily introduced as in the former case, especially in relation to alleged sales, the sales being sought to be proved in the former case for the purpose of proving the direct charge of unlawfully selling intoxicating liquors, while in the present case they were introduced as tending to show the unlawful keeping for sale.

The first point on which defendant relies for a reversal of the judgment is that the court erred in refusing to set aside the information on the ground that the complaint which was filed on the preliminary examination was based merely on information and belief. The complaint, however, does not appear in the record on appeal, nor any record of any ruling of the court on the motion, nor does counsel make any argument upon the question in his brief. We therefore cannot consider it.

The next point raised is that the court erred in refusing to grant a continuance of the case upon the following affidavit:

State of North Dakota, ⎱ ss.
  County of Williams. ⎰

F. L. Gordon, being first duly sworn, upon his oath says that he is the defendant above named, that he had a preliminary examination in the above-entitled action on January 2, 1915, and was bound over to the next term of the district court on said date. That he had no knowledge or information that he was to be tried on the charge herein stated at this term of court until so informed by his attorney on January 5, 1915. That affiant was tried for the same or a similar criminal offense at the present term of court on December 15, 16, 1914, and that at said trial about twenty of the present jury panel were called and examined as to their qualification as jurymen, and several were excused, and twelve of the present panel of jurymen tried the issue, and that affiant was acquitted. That there are two newspapers published in Williston, with a wide circulation in the county of Williams and city of Williston, namely, the Graphic and the Williston Herald. That the Williston Herald purported to give an account of the proceedings and some of the incidents connected therewith in its issue on December 17, 1914,

and that a copy thereof is herewith attached and marked Exihibit "A."
That the Williston Graphic in its issue of December 17, 1914, pur-
ported to give an account of said trial, and that the same is herewith
attached and marked Exhibit "B." That affiant on information and
belief alleges that said article in Exhibit "B" was copied in the grand
Forks Herald and Bismarck Tribune, daily papers, each with a large
circulation in this county, and was also copied in the daily papers in the
cities of St. Paul and Minneapolis, in the state of Minnesota, and in
some of the Eastern daily papers. That said report is untrue in many
particulars, and has a tendency to and did ridicule this defendant, and
was published, as affiant believes, with the intent and purpose of ridicul-
ing the jury and coercing said jury by creating a public sentiment
against the jury and their decision in the case above referred to. Affiant
further alleges on information and belief that a campaign has been
inaugurated against him for the purpose of influencing public sentiment
against him, and preventing him from having a fair trial at the present
term of this court. That it is generally represented in Williston that
affiant has received shipments of twenty-four pints of whisky every day
since the jury acquitted him, and that he has sold a large amount of
whisky, and has offered to sell whisky to police in the city if they came
along, all of which statements or rumors are untrue. Affiant further
alleges that he is a man of limited means, that his financial resources
were exhausted in the trial above mentioned, and that he is without
money or means to employ such counsel as he desires for the trial at this
term of court. That he verily believes that it would be so difficult as to
be practically impossible to secure a jury to give him a fair and im-
partial trial from the present panel, and is informed that the selection of
a jury would entail very large expense to this county and to himself for
per diem of his attorney and witnesses. Affiant further alleges that he
has been using intoxicating liquors to excess for a long time last past;
that since his former trial, on December 16th, 1914, he has been making
an effort to quit using intoxicating liquors, and has placed himself under
the hands of a physician for treatment. That he is advised by his
physician and knows from personal knowledge that his heart action is
very bad, and believes that he is neither in a physical or mental condi-
tion to undergo the worry and strain of a trial at this term of the court.
Affiant further alleges and believes that the conditions herein stated will
not exist at the next term of this court. Affiant further alleges that the

transcript of the testimony taken at the preliminary examination was not filed in this court or accessible to the affiant's attorney until after the filing of the information herein and the arraignment of this defendant. Joseph Cleary appeared for affiant at the trial above mentioned, and has been acting for affiant up to the present time. That said attorney has informed the affiant that he is ill, and will probably not be in a physical and mental condition to take charge of the affiant's defense. That affiant feels that he cannot have a fair and impartial trial at this term of court, wherefore affiant prays that the trial in this case be continued until the next regular term of this court, at which time he believes the conditions herein stated will not exist, and will give him time to earn money to pay for his defense, and that the reasons why he cannot have a fair trial at the present term will not then exist.

(Signed) F. L. Gordon.

Subscribed and sworn to before me this 6th day of January, 1915.

Joseph Cleary,

U. S. Commissioner,

District of North Dakota.

The two exhibits attached to the foregoing affidavit were as follows:

Exhibit "A."

Juryman is arrested. Request for release of prisoner gets Spring Brook man in trouble. Few Cases in District Court—Gordon Acquitted—Horse Thief C ╷ Two Years.

On a charge of misconduct as a juror, O. R. Printy, of Spring Brook, a member of the jury panel drawn for the December term of district court, was arrested by Sheriff Erickson Wednesday on a warrant issued by State's Attorney Burdick. After a hearing before Justice Fields, Printy asked to be tried in district court, and was therefore bound over. He gave a bond for $300, thereby securing his freedom until his case can be taken up. According to the statement of the state's attorney's office, Printy's arrest followed his attempt to secure the dismissal of the case against one of his friends arrested and held on a charge of "bootlegging." It is said Printy approached Mr. Burdick, asking that the culprit be released, as "it wasn't much of an offense anyhow." Printy

had just served on the jury which acquitted F. L. Gordon of the charge of keeping intoxicating liquor for sale at his barber shop on West Broadway.  Also saw Sheriff.  It is said that Printy also made the same request of Sheriff Erickson for the release of his friend and the dismissal of the case, and that thereupon the state's attorney swore out the warrant for his arrest for misconduct.  The arrest of Printy was the most interesting feature of the present session of the district court, which opened Monday.  The first case called on the criminal calendar was that of the State against F. L. Gordon, Gordon being charged with keeping intoxicants for sale.  The trial consumed all day Tuesday and Wednesday morning.  After the charge of the court the jury returned a verdict of "not guilty," and Judge Fisk ordered the prisoner released.  The case of the State against Carl Staatz, charged with selling a forged instrument, was continued upon motion by Attorney Craven for the defense.  Given two years.  Joe Jerome, charged with grand larceny, for stealing a horse belonging to James C. Hanson, north of Zahl, last April, pleaded guilty to the charge Monday, and was sentenced to two years in the state penitentiary by Judge Fisk.  In the case of Joseph Deogitz, charged with assault, the complaining witness could not be located, and the case was dismissed by the court.  Gallagher and Fredericks, charged with selling liquor without a license, pleaded guilty and were sentenced to ninety days each in the county jail.  C. J. Ackey, also arrested on a charge of bootlegging, pleaded guilty.  As this was his first offense, Judge Fisk commuted his sentence and he was released.

### Exhibit "B."

The Jury Turns Gordon Loose.  Prof. Gordon Trial Ended Yesterday Morning—Verdict of Not Guilty.—The Jury—Oscar Swenson, W. B. Ezell, N. A. Lazier, Ed. J. Wright, John Joyce, W. H. Pingrey, H. M. Anneson, O. R. Printy, M. A. Anderson, W. H. Denny, J. C. Brinley, and Alof Netmanger.

Tuesday the case of Prof. F. L. Gordon, the barber, charged with keeping intoxicating liquors for sale, came up for trial.  Three witnesses were called by the state.  The first witness, the Vohs boy, testified that he had gone into the shop and asked for a bottle.  Gordon had

gone out, and, after being gone a short time, came back with a bottle, which he gave him. The boy said he laid a dollar down on the case, and went out. He said he did not know what was in the bottle. He gave it to a friend who took several drinks out of it. Mr. Sipe testified that he got a bottle there. He wasn't sure how much, but he paid something for it. He knew what liquor was, he said, and that this was some kind of liquor. He said he drank out of the bottle, and it was hot stuff. The Great Northern Express agent testified as to shipments of liquor shipped in and billed out to Gordon. He said his records showed that Gordon got a case of liquor on September 2d, 44 pounds of liquor on September 11, another package of 15 pounds in September. In January he received three cases of liquor and one of beer. The records showed the following shipments for Gordon last year: October 8 package liquor 22 lbs.; October 23 package liquor 32 lbs.; October 24 package liquor 32 lbs.; October 30 a case of beer; November 5 package of liquor 25 lbs.; November 8 package of liquor 44 lbs.; November 12 a case of beer; November 17 a case of beer; November 24 package liquor 32 lbs.; December 20 package liquor 24 lbs.; December 29 package liquor 32 lbs.

Prof. Gordon was called to the stand and denied having sold any liquor. He said he was in poor health last year, and his physician (name not given) told him that he would have to drink liquor for his health. He testified that all he got was for his own use. In the cross-examination State's Attorney Burdick asked him about his health, and asked if he had been using the liquor for that purpose. He said, "yes." Asked if he was benefited by it, he said, "Sure, look how nice and fat and fine I am feeling now,"—or words to that effect. Mr. Burdick called his attention to the shipments received last September 23 and 24, and said he must have been feeling better or improving rapidly at that time, and Gordon said he was feeling fine then. He also testified that he was always able to attend to business. It is reported that the first vote of the jury was nine to three for conviction. As we glance over the record of the shipments which Gordon was supposed to have received, we marvel at his capacity, for he said he used it all himself. A man who could drink all this for his "health's sake," and still attend to business at all times, must have a remarkable balance wheel. The testimony of Mr. Sipe was amusing. His memory seemed to be some-

thing he forgot with. He didn't remember much of anything. In fact he did not seem to be very sure whether we had a month of June this year, or not. There has been comment from time to time as to the cause for the increased consumption of liquor *per capita* in this country in recent years. Several years ago the consumption was 4.07 gallons *per capita,* but now it has gone up to 22.79 gallons. However, the cause of considerable of this increase is now brought to light, and easily understood when one glances over the number of gallons which Prof. Gordon, according to his own testimony, got away with "all by himself." SOME MAN!

This objection needs some consideration, and a careful examination of the newspaper articles should be made. The distinction also should be borne in mind between a motion for a continuance, and a motion for a change of venue, and between a claim that the jury or panel is prejudiced or influenced, and a claim that public opinion has been so excited that a fair trial in the county cannot be had. The affidavit alleges in substance: (1) That the defendant had no knowledge that he was to be tried at that term; (2) that he was tried for the same or a similar offense at the same term of court, and at the first trial about twenty of the panel examined on the second trial were examined as jurymen; (3) that certain newspapers published in the city of Williston circulated items derogatory to the defendant, thereby creating a prejudice in the minds of the public and likewise in the minds of the jury; (4) that the defendant was advised by his physician that his heart action was bad, and that he was not in a physical or mental condition to undergo the worry and strain of a trial at the present term of the court.

There are in support of this affidavit none others. The statement of the defendant that he had been advised by his physician that he was unwell would hardly justify a continuance. There is, too, in the affidavit, no real proof of public excitement or prejudice. All that the affidavit states, and this is stated merely on information and belief, is that the newspaper articles were published, and that "a campaign has been inaugurated of this kind for the purpose of influencing public sentiment against him, and preventing him from obtaining a fair trial at the present term of court; that it is generally represented in Willis-

ton that the affiant has received shipments of twenty-four pints of whisky every day since the jury acquitted him, and that he has sold a large amount of whisky, and has offered to sell whisky to the police of the city if they came along, all of which statements or rumors are untrue. . . . That said report is untrue in many particulars, and has a tendency to and did ridicule this defendant, and was published, as affiant believes, with the intent and purpose of ridiculing the jury and, coercing said jury by creating a public sentiment against the jury and their decision in the case above referred to." It is further alleged that the two papers, namely, the Williston Herald and the Williston Graphic, are published in Williston, with a wide circulation in the county of Williams and city of Williston. There is, however, no claim or proof that public sentiment was influenced throughout the county, or that for that reason a fair trial in the county could not be had. All that the defendant, indeed, claims in the affidavit, is "that he verily believes that it would be so difficult as to be practically impossible to secure a jury to give him a fair and impartial trial from the present panel, and is informed that the selection of a jury would entail very large expense to this county and to himself for *per diem* of his attorney and witnesses." The affidavit, in short, does not allege the public prejudice which would justify a change of venue, but is merely a claim that the particular panel may be unfairly influenced. There is no showing whatever that the sentiment throughout the county was such; that talesmen could not be secured, or that a new and unbiased panel could not be obtained. Section 10,787 of the Compiled Laws of 1913 provides that "when a criminal action is called for trial, or at any time previous thereto, the court may, upon sufficient cause shown by either party, direct the trial to be postponed to another day in the same term or to the next term. Any cause that would be considered a good one for a postponement in a civil action is sufficient in a criminal action, whether urged by the state or by the defendant." Section 10,756 of the Compiled Laws of 1913 provides: "The defendant in a criminal action prosecuted by information or indictment in any district court of this state may be awarded a change of the place of trial, upon his petition on oath, or upon the oath of some credible person setting forth that he has reason to believe and does believe, and the facts upon which such belief is based, that he cannot receive a fair and impartial trial in the

county or judicial subdivision where said action is pending, upon any of the following grounds:

"1. That the prosecuting witness, or state's attorney, or other person appointed by the court to prosecute, or any person or corporation promoting said prosecution, has an undue influence over the minds of the people of the county or judicial subdivision where the action is pending; or,

"2. That the people of the county or judicial subdivision are so prejudiced against the defendant or the offense of which he is accused, that he cannot have a fair and impartial trial; or,

"3. That it is impossible to obtain a jury in the county or judicial subdivision that has not formed an opinion, as to the guilt or innocence of the defendant, such as would disqualify them as jurors; or,

"4. That any other cause exists in the county or judicial subdivision, where the action is pending, whereby the defendant would probably be deprived of a fair and impartial trial."

There is certainly no showing in the affidavit which would entitle the defendant to a change of venue, as there is no showing that the prejudice, if any, exists throughout the county or judicial subdivision.

Even, therefore, if the application be treated as a substitute for an application for a change of venue, there was no error committed in refusing to entertain it. It is also well established by the weight of authority that the proper motion in such a case is that for a change of venue, and not for a continuance. See 9 Cyc. 87, and cases cited; 9 Cyc. 189, and cases cited. It is, too, well established that in order to justify a change of venue or a continuance in those jurisdictions where a continuance is authorized, the excitement of public prejudice "must be such that its natural tendency would be to intimidate or swerve the jury; and as the court in which the cause is pending can much better determine the propriety of a postponement on this ground than the appellate court, it requires a very strong showing to induce the upper court to interfere." 9 Cyc. 189; Walker v. State, 136 Ind. 663, 36 N. E. 356.

As we have before intimated, no such strong showing is made. We cannot assume prejudice or fear on the part of the trial judge himself, as his rulings throughout the trial and his instructions to the jury were pre-eminently fair. There is, too, in the affidavit no real objection of

public excitement or prejudice. At the most, the claim is that there was an attack upon the jury, and the evil consequences of this attack are by no means apparent. There is nothing even to indicate an attack except the headline that the jury "turned Gordon loose," and the names of the jurymen on the former trial, some of whom served on the second trial. The articles, it is true, made fun of the contention of the defendant that he himself could have consumed all of the liquor which was receipted for by him at the express office. It perhaps, also, misstates the quantity of the liquor. In making fun of the defendant, however, the paper did nothing more than counsel for the state would have done or could have done in arguing the case to the jury, and we cannot very well say that newspaper articles which were published on December the 17th were in the minds of the jury, even if they had been read, when they tried the case and returned the verdict after the Christmas holidays and on January 22d; that is to say, over a month afterwards. There is, too, in the record, no evidence that any of the jurymen read or saw the articles. There is no record whatever of the examination of such jurymen, or of the answers they gave to the questions propounded them, and we must assume, therefore, that they properly qualified. So far, too, as the misstatements are concerned, if misstatements there were, although we depreciate exceedingly the publication of newspaper articles during the term of court which in any way reflect upon any of the litigants at such term, we can hardly say that prejudice is shown, or believe that we would be justified in overruling the discretion of the trial judge in the matter. "Newspaper reports [indeed] are ordinarily regarded as too unreliable to influence a fair-minded man when called upon to pass upon the merits of a case in the light of evidence given under oath; and it is now a well-settled rule that a juror, although he may have formed an opinion from reading such reports, is competent if he states that he is without prejudice, and can try the case impartially according to the evidence, and the court is satisfied that he will do so." 24 Cyc. 298.

We are not unmindful of the cases cited in the note in 46 L.R.A. (N.S.) 741, 744, and of the cases of Meyer v. Cadwalader, 49 Fed. 32, and Morse v. Montana Ore-Purchasing Co. 105 Fed. 337. The articles in the majority of these cases, however, were published during the particular trial, while in the case of Meyer v. Cadwalader, one of

the parties litigant seems to have been directly responsible for them. They were, in fact, interviews had with him, and which served as testimony which was not under oath, and given out of court. So, too, as we have before said, these matters are largely within the discretion of the trial judge, and his determination will not be reversed except upon a clear proof of abuse of that discretion. See note in 46 L.R.A.(N.S.) 745. It is also quite generally held that a case will not be reversed on such grounds, and even where the jury reads an article pending the proceedings, where "it affirmatively appears from the evidence in the case that the jury could not have returned, honestly or intelligently, any other verdict than the one that it did return." See State v. Williams, 96 Minn. 351, 105 N. W. 266; Burns v. State, 145 Wis. 373, 140 Am. St. Rep. 1081, 128 N. W. 987; Com. v. Chauncey, 2 Ashm. (Pa.) 90; note in 46 L.R.A.(N.S.) 747. We are satisfied that in the case at bar no other verdict than that which was rendered could have been honestly returned.

Anyway, even after the motion for a continuance had been denied, the defendant had the opportunity to challenge the panel and to show prejudice of the jurymen on the *voir dire* examination; and, there being no showing that an impartial panel or impartial talesmen could not have been obtained, or in fact that any of the jurymen were in fact disqualified, we must hold that the defendant had abundant opportunity to protect his rights; that there was no showing of prejudice; and that the trial judge did not abuse his discretion in overruling the motion.

The next point raised is alleged error in allowing different witnesses to testify as to having purchased whisky from the defendant, the objection being made that such evidence was incompetent, irrelevant, and immaterial, not within the issues, no foundation laid, and an attempt to prove a collateral offense. The collateral offense, of course, hinted at, was selling liquor in violation of law. It is well established, however, as was correctly charged by the court, that "such evidence is admissible as a circumstance tending to prove the crime charged; that is, that the defendant kept for sale intoxicating liquors as a beverage."

It is next urged that the court erred in allowing in evidence the delivery book of the express company, in which various consignments of liquor were receipted for by the defendant, and in spite of the fact that the original bills of lading or shipping bills were not introduced. This

evidence was perfectly competent. It was certainly evidence of the fact that the defendant received liquor at the express office, and it is immaterial how or by what means the liquor reached that office. It was evidence of receipt and delivery, even if not evidence of the order for or purchase thereof, and of the transmission. It is next objected that the express agent did not sufficiently identify the signature of the defendant. There is, however, no merit in this.

The witness testified that he thought he knew the signature of the defendant, that to the best of his knowledge and belief it was his signature, and in addition to this the defendant himself afterwards admitted that a number of the signatures were his, and in no case positively denied the genuineness of any of them. The general question in fact was asked him, "Have you any reason to believe, Mr. Gordon, that any of those signatures there appearing as F. L. Gordon receipting for those shipments are not your signature?" And the witness answered, "No, I haven't. I want the jury to understand that I used this liquor for my own use and the use of my family. Perhaps I have got a little left down there. I don't know how much."

And again:

Q. November 3d, 11, 13, and 20, Box. Liquor, 44 pounds. Do you want them to understand you used all of this for your own use?

A. Is my signature behind all of these?

Q. I think so. What is contained in those boxes of liquor, 44 pounds, that you receipted for?

A. I don't know. That is the box of bottles, 24 pints a case, in this shipment. I understand now that I am charged with the offense covering a different period of time than that in which I was found not guilty.

And again:

Q. Showing you the express records from July 9th, I will ask you if that is your signature which appears as receipting for a box of liquor, 44 pounds, on the 9th day of July?

A. Don't look like my F.

Q. I will ask you to sign your name F. L. Gordon on that slip of paper.

(Witness complies.)

Q. I will show you your signature, F. L. Gordon, receipting for two boxes of liquor on the 28 of July, and ask you if that is your signature.

A. It looks correct.

Counsel for state would offer in evidence Exhibit "A" as a sample of defendant's handwriting of his name, F. L. Gordon.

Counsel for defendant: Defendant objects to introduction of the exhibit as incompetent, no proper method of proving his signature, not made at the time or prior to the time of the alleged signature.

The Court: Overruled.

We thus see that the jury had ample means of comparing the signatures. Objection, it is true, was made to the introduction of the exhibit. No objection, however, was made to signing the exhibit on the ground of self-incrimination or any other ground. The objection merely was that it was no proper method of proving his signature, not made at the time or prior to the time of the alleged signature. The insufficiency of this objection must be apparent to all. Cochrane v. National Elevator Co. 20 N. D. 169, 127 N. W. 725; Gambrill v. Schooley, 95 Md. 260, 63 L.R.A. 428, 52 Atl. 500.

Much stress is also laid upon the proposition that the liquor was not actually kept for sale in the barber shop. The majority of the witnesses, it is true, testified that all they did was to nod at the defendant. That he usually went out, that they remained in the barber shop for some time, and then went into the back room and found a bottle on the bed; that they then dropped a dollar on the bed, took the bottle, and left. From this it is argued, and the defendant himself testified, that on several occasions at least, and the only occasions on which he admits having given the liquor to outsiders, he went out and purchased the liquor elsewhere as agent of his customer. There is, however, no proof that the money was given to him in the first instance with which to buy the liquor, or that any specific instructions were given to him. All there was was a nod or intimation of the customer that he was thirsty, or a question as to whether something could not be obtained. There is proof, too, that on one occasion the liquor was taken from a cupboard. The defendant himself admits that he was in the habit of bringing liquor down to the shop, but for his own consumption, and keeping it under the bed. The defendant also contends that the liquor, if kept anywhere, was at his house, and concedes that a large quantity was

kept at the house. The allegation of the information, however, is not specific as to the premises on which the liquor was kept. No objection was made to it on the ground of indefiniteness, and it seems to us to be immaterial whether the main supply was kept in the shop or in the house, as the delivery was certainly made from the shop where a temporary keeping must at any rate have been involved. The proof is clear that the defendant received large quantities of liquor. It is uncontroverted to our minds that between the 4th day of July and the 30th day of November he received seven cases of beer, one keg of beer, and one hundred and ninety-two pints of whisky, and that between November 3d and November 20th, two cases of beer and thirty-eight pints of whisky were delivered to him. This, in itself, is evidence of keeping for unlawful purposes. Klepfer v. State, 121 Ind. 491, 23 N. E. 287; State v. Dahlquist, 17 N. D. 40, 115 N. W. 81; State v. Reilly, 22 N. D. 353, 133 N. W. 914.

Nor is there any merit in the objection that the agent of the express company was allowed to explain the meanings of the abbreviations on his receipt book, such as "Liq.," which he explained stood for liquor, and "Bx.," which he explained as standing for box, and "Cs.," which he explained to be an abbreviation for cases. Such evidence is not only admissible (State v. McKone, 31 N. D. 547, 154 N. W. 256), but these abbreviations are so commonly used that the court may take judicial notice of their meaning. They are as commonly used, indeed, as the terms "O. K." and "E. & O. E." which are everywhere known and recognized.

The judgment of the District Court is affirmed.