NYE ET AL. *v.* UNITED STATES ET AL.

No. 558. Argued March 12, 1941.—Decided April 14, 1941.

34

*Mr. Lycurgus R. Varser,* with whom *Messrs. J. Bayard Clark* and *O. L. Henry* were on the brief, for petitioners.

36

*Mr. Herbert Wechsler,* with whom *Solicitor General Biddle, Assistant Attorney General Berge,* and *Mr. Louis B. Schwartz* were on the brief, for the United States.

38

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Petitioners were adjudged guilty of contempt under § 268 of the Judicial Code (36 Stat. 1163, 28 U. S. C. § 385) for their efforts to obtain a dismissal of a suit brought by one Elmore in the federal District Court for the Middle District of North Carolina. Elmore, administrator of the estate of his son, brought that action, *in forma pauperis,* against one Council and Bernard, partners, trading as B. C. Remedy Co., and alleged that his son died as a result of the use of a medicine, known as B C and manufactured and sold by them. The court appointed William B. Guthrie to represent Elmore. Defendants filed an answer April 29, 1939. On April 19, 1939, Elmore notified the District Judge and his lawyer by letters that he desired to have the case dismissed. The substance of the episode involving the improper conduct of petitioners was found as follows:

Elmore is illiterate and feeble in mind and body. Petitioners,[1] through the use of liquor and persuasion, induced Elmore to seek a termination of the action. Nye directed his own lawyer to prepare the letters to the District Judge and to Guthrie and to prepare a final administration account to be filed in the local probate court. Nye took Elmore to the probate court, had him discharged as administrator, and paid the clerk a fee of $1.

---

[1] Nye's daughter was married to the son of Council, one of the defendants in the Elmore action. Mayers (Meares) was Nye's tenant who was acquainted with Elmore.

He then took Elmore to the postoffce, registered the letters and paid the postage. Elmore, however, was not promised or paid anything. These events took place more than 100 miles from Durham, North Carolina, where the District Court was located.

On September 30, 1939, Guthrie filed a motion [2] asking for an order requiring Nye to show cause "why he should not be attached and held as for contempt of this Court."[3] The court issued a show cause order to Nye and Mayers who filed their answers. There was a hearing. Evidence was introduced and argument was heard on motions to dismiss. The court found that the writing of the letters and the filing of the final account were pro-

---

[2] The court had deferred action on Elmore's inspired request for a dismissal at the request of Guthrie and pending an investigation by him. On July 20, 1939, Nye and Elmore's son were examined under oath before the court as to the episode. On August 29, 1939, defendants moved to dismiss Elmore's action on the ground that he had been discharged as administrator. A hearing was held on that motion and Elmore testified respecting his discharge. The evidence so adduced was the basis of the motion for an order to show cause on September 30, 1939.

[3] The motion for an order to show cause also prayed: "2. That the Court call to the attention of the United States District Attorney for this district the entire record in this cause with request to the said United States District Attorney to investigate the question as to whether or not a conspiracy was entered into by and between R. H. Nye, W. E. Timberlake and L. C. Mayers, all of Robeson County, North Carolina, to defeat the administration of justice and the orderly process of this Court and further as to whether or not they have been guilty of subornation of perjury and further whether they conspired to practice a fraud and did practice a fraud upon this Court. 3. That this matter through the office of the United States District Attorney for this district be submitted and inquired into by the Grand Jury for such action and attention the Grand Jury shall deem proper. 4. For such other and further procedure as to this Court may seem proper."

cured by Nye "for the express and definite purpose of preventing the prosecution of the civil action in the federal court and with intent to obstruct and to prevent the trial of the case on its merits"; and that the conduct of Nye and Mayers "did obstruct and impede the due administration of justice in this cause; that the conduct has caused a long delay, several hearings and enormous expense." It accordingly held that their conduct was "misbehavior so near to the presence of the court as to obstruct the administration of justice" and adjudged each guilty of contempt. It ordered Nye to pay the costs of the contempt proceedings, including $500 to Guthrie, and a fine of $500; and it ordered Mayers to pay a fine of $250. The District Court filed its finding of facts and judgment on February 8, 1940. On March 15, 1940, petitioners filed a notice of appeal from the judgment.[4] The Circuit Court of Appeals affirmed that judgment.[5] 113 F. 2d 1006. We granted the petition for certiorari because the interpretation of the power of the federal courts under § 268 of the Judicial Code to punish contempts raised matters of grave importance.

We are met at the threshold with a question as to the jurisdiction of the Circuit Court of Appeals over the appeal. The government concedes that if this was a case of civil contempt, the notice of appeal was effective under Rule 73 of the Rules of Civil Procedure. It argues, however, that the contempt was criminal—in which case the appeal was not timely if the Criminal Appeals Rules

---

[4] On March 13, 1940, Elmore, with the assent of Guthrie, submitted to a judgment of voluntary non-suit in the action for wrongful death upon payment of a "substantial sum."

[5] The United States was made a party when the case was docketed in the Circuit Court of Appeals. It entered its appearance but its attorneys apparently took no further part in the proceedings in that court.

govern,[6] and not made in the proper form if § 8(c) of the Act of February 13, 1925 (43 Stat. 936, 940, 45 Stat. 54, 28 U. S. C. § 230) is applicable.[7]

We do not think this was a case of civil contempt. We recently stated in *McCrone* v. *United States,* 307 U. S. 61, 64, "While particular acts do not always readily lend themselves to classification as civil or criminal contempts, a contempt is considered civil when the punishment is wholly remedial, serves only the purposes of the complainant, and is not intended as a deterrent to offenses against the public." The facts of this case do not meet that standard. While the proceedings in the District Court were entitled in Elmore's action and the United States was not a party until the appeal, those circumstances though relevant (*Gompers* v. *Bucks Stove & Range Co.,* 221 U. S. 418, 445–446) are not conclusive as to the nature of the contempt. The fact that Nye was ordered to pay the costs of the proceeding, including $500 to Guthrie, is also not decisive. As Mr. Justice Brandeis stated in *Union Tool Co.* v. *Wilson,* 259 U. S. 107, 110, "Where a fine is imposed partly as compensation to the complainant and partly as punishment, the criminal feature of the order is dominant and fixes

---

[6] Promulgated May 7, 1934. Rule III provides that an appeal shall be taken within five days after entry of judgment of conviction or of an order denying a motion for new trial. In the present case, the notice of appeal was filed more than a month after the judgment of the District Court. In case the Criminal Appeals Rules govern, the government also points out that Rule XI requires that petitions for certiorari to review a judgment of the appellate court shall be made within thirty days after the entry of judgment of that court. In the present case the petition for a writ of certiorari was filed about two months after the judgment of the Circuit Court of Appeals.

[7] "No appeal intended to bring any judgment or decree before a circuit court of appeals for review shall be allowed, unless application therefor be duly made within three months after the entry of such judgment or decree."

its character for purposes of review." The order imposes unconditional fines payable to the United States. It awards no relief to a private suitor. The prayer for relief [8] and the acts charged [9] carry the criminal hallmark. Cf. *Gompers* v. *Bucks Stove & Range Co., supra,* p. 449. They clearly do not reveal any purpose to punish for contempt "in aid of the adjudication sought in the principal suit." *Lamb* v. *Cramer,* 285 U. S. 217, 220. When there is added the "significant" fact (*Bessette* v. *W. B. Conkey Co.,* 194 U. S. 324, 329) that Nye and Mayers were strangers, not parties, to Elmore's action, there can be no reasonable doubt that the punitive character of the order was dominant.

We come then to the question of the jurisdiction of the Circuit Court of Appeals. We disagree with the government in its contention that the appeal in this case was governed by the Criminal Appeals Rules. Those rules were promulgated pursuant to the provisions of the Act of March 8, 1934 (48 Stat. 399; 28 U. S. C. § 723a) which provided, *inter alia,* that this Court should have "the power to prescribe, from time to time, rules of practice and procedure with respect to any or all proceedings after verdict, or finding of guilt by the court if a jury has been waived, or plea of guilty, in criminal cases." The rules were adopted "as the Rules of Practice and Procedure in all proceedings after plea of guilty, verdict of guilt by a jury or finding of guilt by the trial court where a jury is waived, in criminal cases." 292 U. S. 661. In this case there was no plea of guilty, there was

---

[8] *Supra,* note 3.

[9] On October 30, 1939, the District Court denied motions to dismiss the rule to show cause saying that "the question to be determined is whether the respondents, or either of them, is guilty of misbehavior in the presence of the Court, or so near thereto to obstruct the administration of justice in this Court, and that is a matter of fact to be determined by the evidence and not on motion."

no verdict of guilt by a jury, and there was no finding of guilt by the court where a jury was waived. To be sure, the rules and the Act are applicable "in criminal cases." But we do not agree with the government that the qualifying language of the rules designates merely the stage of the proceedings "in criminal cases" when the rules become applicable. It is our view that the rules describe the kinds of cases to which they are to be applied. The Act of March 8, 1934 amended the Act of February 24, 1933 (47 Stat. 904) which gave this Court rule-making power "with respect to any or all proceedings after verdict in criminal cases." The legislative history makes it abundantly clear that the amendment in 1934, so far as material here, was made because "it would not seem to be desirable that there should be different times and manner of procedure in cases of appeal where there is a verdict of a jury as distinguished from cases in which there is a finding of guilt by the court on the waiver of a jury." H. Rep. No. 858, 73d Cong., 2d Sess., p. 1; S. Rep. No. 257, 73d Cong., 2d Sess., p. 1. In light of this history and the language of the order promulgating the rules we conclude that the categories of cases embraced in the rules cannot be expanded by interpretation to include this type of case.

That conclusion means that this appeal was governed by § 8 (c) of the Act of February 13, 1925. The Court is equally divided in opinion as to whether the Circuit Court of Appeals, in absence of an application for allowance of the appeal, had the power to decide the case on the merits. Hence the action of that court in taking jurisdiction over the appeal is affirmed.

We come then to the merits.

The question is whether the conduct of petitioners constituted "misbehavior . . . so near" the presence of the court "as to obstruct the administration of justice" within

the meaning of § 268 of the Judicial Code.[10]   That section derives from the Act of March 2, 1831 (4 Stat. 487). The Act of 1789 (1 Stat. 73, 83) provided that courts of the United States "shall have power . . . to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same."   Abuses arose,[11] culminating in impeachment proceedings against James H. Peck, a federal district judge, who had imprisoned and disbarred one Lawless for publishing a criticism of one of his opinions in a case which was on appeal.   Judge Peck was acquitted.[12]   But the history of that episode makes abundantly clear that it served as the occasion for a drastic delimitation by Congress of the broad undefined power of the inferior federal courts under the Act of 1789.

The day after Judge Peck's acquittal Congress took steps to change the Act of 1789.   The House directed its Committee on the Judiciary "to inquire into the expediency of defining by statute all offences which may be punished as contempts of the courts of the United States, and also to limit the punishment for the same." [13]   Nine

---

[10] This section provides: "The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: *Provided*, That such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts."

[11] See Nelles & King, Contempt by Publication in the United States, 28 Col. L. Rev. 401, 409 *et seq.*

[12] Stansbury, Report of the Trial of James H. Peck (1833).

[13] 7 Cong. Deb., 21st Cong., 2d Sess., Feb. 1, 1831, Cols. 560–561. And see House Journal, 21st Cong., 2d Sess., p. 245.

days later James Buchanan brought in a bill which be-
came the Act of March 2, 1831. He had charge of the
prosecution of Judge Peck and during the trial had told
the Senate: [14] "I will venture to predict, that whatever
may be the decision of the Senate upon this impeach-
ment, Judge Peck has been the last man in the United
States to exercise this power, and Mr. Lawless has been
its last victim." The Act of March 2, 1831, "declaratory
of the law concerning contempts of court," contained two
sections, the first of which provided:

"That the power of the several courts of the United
States to issue attachments and inflict summary punish-
ments for contempts of court, shall not be construed to
extend to any cases except the misbehaviour of any per-
son or persons in the presence of the said courts, or so
near thereto as to obstruct the administration of justice,
the misbehaviour of any of the officers of the said courts
in their official transactions, and the disobedience or re-
sistance by any officer of the said courts, party, juror,
witness, or any other person or persons, to any lawful
writ, process, order, rule, decree, or command of the
said courts."

Sec. 2 of that Act, from which § 135 of the Criminal
Code [15] (35 Stat. 1113, 18 U. S. C. § 241) derives,
provided:
"That if any person or persons shall, corruptly, or by
threats or force, endeavour to influence, intimidate, or
impede any juror, witness, or officer, in any court of the

---

[14] Stansbury, *op. cit.* p. 430.

[15] That section presently provides: "Whoever corruptly, or by
threats or force, or by any threatening letter or communication,
shall endeavor to influence, intimidate, or impede any witness, in any
court of the United States or before any United States commissioner
or officer acting as such commissioner, or any grand or petit juror,
or officer in or of any court of the United States, or officer who may
be serving at any examination or other proceeding before any United

United States, in the discharge of his duty, or shall, corruptly, or by threats or force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person or persons, so offending, shall be liable to prosecution therefor, by indictment, and shall, on conviction thereof, be punished, by fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both, according to the nature and aggravation of the offence."

In 1918 this Court in *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 418, 419, stated that "there can be no doubt" that the first section of the Act of March 2, 1831 "conferred no power not already granted and imposed no limitations not already existing"; and that it was "intended to prevent the danger by reminiscence of what had gone before, of attempts to exercise a power not possessed which . . . had been sometimes done in the exercise of legislative power." The inaccuracy of that historic observation has been plainly demonstrated. Frankfurter & Landis, *Power of Congress Over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers,* 37 Harv. L. Rev. 1010. Congress was responding to grievances arising out of the exercise of judicial power as dramatized by the Peck impeachment proceedings. Congress was intent on curtailing that power. The two sections of the Act of March 2, 1831 when read together, as they must be, clearly indicate that the category of criminal cases which could be tried without a jury was narrowly confined. That the previously undefined power of the courts was

States commissioner or officer acting as such commissioner, in the discharge of his duty, or who corruptly or by threats or force, or by any threatening letter or communication, shall influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice therein, shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both."

substantially curtailed by that Act was early recognized by lower federal courts. *United States* v. *Holmes,* Fed. Cas. No. 15,383, at p. 363; *Ex parte Poulson,* Fed. Cas. No. 11,350; *United States* v. *New Bedford Bridge,* Fed. Cas. No. 15,867, at p. 104; *United States* v. *Seeley,* Fed. Cas. No. 16,248a; *United States* v. *Emerson,* 4 Cranch (C. C.) 188; Fed. Cas. No. 15,050; Kent's Commentaries (3rd ed. 1836) pp. 300–301. And when the Act came before this Court in *Ex parte Robinson,* 19 Wall. 505, 511, Mr. Justice Field, speaking for the Court, acknowledged that it had limited the power of those courts. And see *Ex parte Bradley,* 7 Wall. 364, 374. So far as the decisions of this Court are concerned, that view persisted to the time when *Toledo Newspaper Co.* v. *United States, supra,* was decided. See *Ex parte Wall,* 107 U. S. 265; *Savin, Petitioner,* 131 U. S. 267, 276; *Cuddy, Petitioner,* 131 U. S. 280, 285; *Eilenbecker* v. *District Court,* 134 U. S. 31, 38.

Mindful of that history, we come to the construction of § 268 of the Judicial Code in light of the specific facts of this case. The question is whether the words "so near thereto" have a geographical or a causal connotation. Read in their context and in the light of their ordinary meaning, we conclude that they are to be construed as geographical terms. In *Ex parte Robinson, supra,* at p. 511, it was said that as a result of those provisions the power to punish for contempts "can only be exercised to insure order and decorum" in court. "Misbehavior of any person in their presence" plainly falls in that category. *Ex parte Terry,* 128 U. S. 289. And in *Savin, Petitioner, supra,* it was also held to include attempted bribes of a witness, one in the jury room and within a few feet of the court room and one in the hallway immediately adjoining the court room. See *Cooke* v. *United States,* 267 U. S. 517. The phrase "so near thereto as to obstruct the administration of justice" likewise con-

notes that the misbehavior must be in the vicinity of the court. Nelles & King, *Contempt by Publication in the United States*, 28 Col. L. Rev. 525, 530. It is not sufficient that the misbehavior charged has some direct relation to the work of the court. "Near" in this context, juxtaposed to "presence," suggests physical proximity not relevancy. In fact, if the words "so near thereto" are not read in the geographical sense, they come close, as the government admits, to being surplusage. There may, of course, be many types of "misbehavior" which will "obstruct the administration of justice" but which may not be "in" or "near" to the "presence" of the court. Broad categories of such acts, however, were expressly recognized in § 2 of the Act of March 2, 1831 and subsequently in § 135 of the Criminal Code. It has been held that an act of misbehavior though covered by the latter provisions may also be a contempt if committed in the "presence" of the Court. *Savin, Petitioner, supra.* And see *Sinclair* v. *United States*, 279 U. S. 749. Yet in view of the history of those provisions, meticulous regard for those separate categories of offenses must be had, so that the instances where there is no right to jury trial will be narrowly restricted. If "so near thereto" be given a causal meaning, then § 268 by the process of judicial construction will have regained much of the generality which Congress in 1831 emphatically intended to remove. See Thomas, *Problems of Contempt of Court* (1934) c. VII. If that phrase be not restricted to acts in the vicinity of the court but be allowed to embrace acts which have a "reasonable tendency" to "obstruct the administration of justice" (*Toledo Newspaper Co.* v. *United States, supra,* p. 421) then the conditions which Congress sought to alleviate in 1831 have largely been restored. See Fox, *The History of Contempt of Court* (1927) c. IX. The result will be that the offenses which Congress designated as true crimes under § 2 of the Act of March 2,

1831 will be absorbed as contempts wherever they may take place. We cannot by the process of interpretation obliterate the distinctions which Congress drew.

We are dealing here only with a problem of statutory construction, not with a question as to the constitutionally permissible scope of the contempt power. But that is no reason why we should adhere to the construction adopted by *Toledo Newspaper Co.* v. *United States, supra,* and leave to Congress the task of delimiting the statute as thus interpreted. Though the statute in question has been on the books for over a century, it has not received during its long life the broad interpretation which that decision gave it. Rather, that broad construction is relatively recent. So far as decisions of this Court are concerned, the statute did not receive any such expanded interpretation until *Toledo Newspaper Co.* v. *United States, supra,* was decided in 1918. The decisions of this Court prior to 1918 plainly recognized, as we have noted, that Congress through the Act of March 2, 1831 had imposed a limitation on the power to punish for contempts—a view consistent with the holdings of the lower federal courts during the years immediately following the enactment of the statute. The early view was best expressed in *Ex parte Poulson, supra,* decided in 1835. In that case it was held that the Act of March 2, 1831 gave the court no power to punish a newspaper publisher for contempt for publishing an "offensive" article relative to a pending case. It was held that the first section of the Act "alludes to that kind of misbehavior which is calculated to disturb the order of the court, such as noise, tumultuous or disorderly behavior, either in or so near to it as to prevent its proceeding in the orderly dispatch of its business." p. 1208. That was a plain recognition that the words "so near thereto" connoted physical proximity. And prior to 1918 the decisions of this Court did not depart from that theory,

however they may have expanded the earlier notions of "misbehavior." To be sure, the lower federal courts in the intervening years had expressed a contrariety of views on the meaning of the statute [16] and some were giving it an expanded scope [17] which was later approved in *Toledo Newspaper Co.* v. *United States, supra.* But it is significant that not until after the turn of this century did the first line of fracture appear suggesting that the statute authorized summary punishment for publication.[18] Thus the legislative history of this statute and its career demonstrate that this case presents the question of correcting a plain misreading of language and history so as to give full respect to the meaning which Congress unmistakably intended the statute to have. Its legislative history, its interpretation prior to 1918, the character and nature of the contempt proceedings, admonish us not to give renewed vitality to the doctrine of *Toledo Newspaper Co.* v. *United States, supra,* but to recognize the substantial legislative limitations on the contempt power which were occasioned by the Judge Peck episode. And they necessitate an adherence to the original construction of the statute so that, unless its requirements are clearly satisfied, an offense will be dealt with as the law deals with the run of illegal acts. Cf. Mr. Justice Holmes

---

[16] That "so near thereto" is a geographical term see *Ex parte Schulenburg,* 25 F. 211, 214 (1885); *Hillmon* v. *Mutual Life Ins. Co.,* 79 F. 749 (1897); *Morse* v. *Montana Ore-Purchasing Co.,* 105 F. 337, 347 (1900); *Cuyler* v. *Atlantic & N. C. R. Co.,* 131 F. 95 (1904). And see Nelles & King, *op. cit.,* pp. 532, 539–542.

[17] For cases expanding the concept of "presence" and "so near thereto" see *In re Brule,* 71 F. 943 (1895); *McCaully* v. *United States,* 25 App. D. C. 404 (1905); *United States* v. *Zavelo,* 177 F. 536 (1910); *Kirk* v. *United States,* 192 F. 273 (1911); *In re Independent Pub. Co.,* 228 F. 787 (1915).

[18] Nelles & King, *op. cit.,* p. 539 citing *Ex parte McLeod,* 120 F. 130 (1903) and *United States* v. *Huff,* 206 F. 700 (1913).

dissenting in *Toledo Newspaper Co.* v. *United States, supra,* pp. 422 *et seq.*

The conduct of petitioners (if the facts found are taken to be true) was highly reprehensible. It is of a kind which corrupts the judicial process and impedes the administration of justice. But the fact that it is not reachable through the summary procedure of contempt does not mean that such conduct can proceed with impunity. Section 135 of the Criminal Code, a descendant of § 2 of the Act of March 2, 1831, embraces a broad category of offenses. And certainly it cannot be denied that the conduct here in question comes far closer to the family of offenses there described than it does to the more limited classes of contempts described in § 268 of the Judicial Code. The acts complained of took place miles from the District Court. The evil influence which affected Elmore was in no possible sense in the "presence" of the court or "near thereto." So far as the crime of contempt is concerned, the fact that the judge received Elmore's letter is inconsequential.

We may concede that there was an obstruction in the administration of justice, as evidenced by the long delay and large expense which the reprehensible conduct of petitioners entailed. And it would follow that under the "reasonable tendency" rule of *Toledo Newspaper Co.* v. *United States, supra,* the court below did not err in affirming the judgment of conviction. But for the reasons stated that decision must be overruled. The fact that in purpose and effect there was an obstruction in the administration of justice did not bring the condemned conduct within the vicinity of the court in any normal meaning of the term. It was not misbehavior in the vicinity of the court disrupting to quiet and order or actually interrupting the court in the conduct of its business. Cf. *Savin, Petitioner, supra,* at p. 278. Hence, it was not embraced within § 268 of the Judicial Code.

If petitioners can be punished for their misconduct, it must be under the Criminal Code where they will be afforded the normal safeguards surrounding criminal prosecutions. Accordingly, the judgment below is

*Reversed.*

Mr. Justice Stone, dissenting:

The court below did not pass on the question, mooted here, whether it acquired jurisdiction under the appeal provisions of the applicable section, 8 (c), of the Jurisdictional Act of February 13, 1925. Only four members of this Court are of opinion that it did. Assuming for present purposes that it had jurisdiction to decide the merits, I think its decision was right and that the judgment below should be affirmed.

We are concerned here only with the meaning and application of an act of Congress which has stood unamended on the statute books for one hundred and ten years. It gives statutory recognition to the power of the federal courts to punish summarily for contempt and provides that that power "shall not be construed to extend to any cases except the misbehavior of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice."

The issue is not whether this statute has curtailed an authority which federal courts exercised before its enactment. Concededly it has. The only question before us is whether it has so limited that authority as to preclude summary punishment of the contemptuous action of petitioner which, it is not denied, is "misbehavior" although not in the presence of the court, and which, it is admitted, seriously obstructed the administration of justice in a cause pending in the court. The question is important, for if conduct such as this record discloses may not be dealt with summarily the only recourse of a federal court for the protection of the integrity of proceed-

ings pending before it, from acts of corruption and intimidation outside the court room, is to await the indictment of the offenders, with or without adjournment of the pending proceedings as the exigencies of the case may require.

It is not denied that the distance of the present contemptuous action from the court in miles did not lessen its injurious effect, and in that sense it was "near" enough to obstruct the administration of justice. The opinion of the Court supports its conclusion on the ground that "near" means only geographical nearness and so implicitly holds that no contempt is summarily punishable unless it is either in the presence of the court or is some kind of physical interference with or disturbance of its good order, so that the nearness to the court of the contemptuous act has an effect in obstructing justice which it would not have if it took place at a more distant point. From all this it seems to follow that the surreptitious tampering with witnesses, jurors or parties in the presence of the court, although unknown to it, would be summarily punishable because in its presence, but that if it took place outside the court room or while the witness, juror or party was on his way to attend court it would not be punishable because geographical nearness is not an element in making the contemptuous action an obstruction to justice.

These contentions assume that "so near thereto" can only refer to geographical position and they ignore the entire history of the judicial interpretation of the statute. "Near" may connote proximity in causal relationship as well as proximity in space, and under this statute, as the opinion seems to recognize, even the proximity to the court, in space, of the contemptuous action, is of significance only in its causal relationship to the obstructions to justice which result from disorder or public disturbances. This Court has hitherto, without a dissenting

voice, regarded the phrase "so near thereto" as connoting and including those contempts which are the proximate cause of actual obstruction to the administration of justice, whether because of their physical nearness to the court or because of a chain of causation whose operation in producing the obstruction depends on other than geographical relationships to the court. See *Savin, Petitioner*, 131 U. S. 267; *Cuddy, Petitioner*, 131 U. S. 280; *Toledo Newspaper Co.* v. *United States*, 247 U. S. 402; *Sinclair* v. *United States*, 279 U. S. 749, 764, 765; *Craig* v. *Hecht*, 263 U. S. 255. Cf. *McCann* v. *New York Stock Exchange*, 80 F. 2d 211, 213. Contempts which obstruct justice because of their effect on the good order and tranquillity of the court must be in the presence of the court or geographically near enough to have that effect. Contempts which are surreptitious obstructions to justice, through tampering with witnesses, jurors and the like, must be proximately related to the condemned effect. We are pointed to no legislative history which militates against such a construction of the statute.

In the *Savin,* the *Craig,* and the *Sinclair* cases, as well as in the *Toledo* case, the contempts were of this latter kind. The contempt held summarily punishable by this Court in the *Savin* case, decided sixty years ago, was the attempted bribery of a witness at a place in the court house but outside the courtroom, without any disorder or disturbance of the court. The contemptuous acts in the other cases took place at points distant from the court in the city where it sat. In all, the injurious effect on the administration of justice was unrelated to the distance from the court. In holding that they were contempts within the summary jurisdiction of the court this Court definitely decided that "so near thereto" is not confined to a spatial application where the evil effect of the alleged contempt does not depend upon its physical nearness to the court.

The *Savin* and *Sinclair* cases were decided by a unanimous court. The dissenting judges in the *Toledo* and *Craig* cases, in which the acts held to be contemptuous were the publication, at a distance from the court, of comments derogatory to the judge, made no contention that the phrase imposed a geographical limitation on the power of the court. Their position was that the particular contemptuous acts charged did not in fact have the effect of obstructing justice, a contention which cannot be urged here. In the *Toledo* case, Justice Holmes said, page 423: "I think that 'so near as to obstruct' means so near as actually to obstruct—and not merely near enough to threaten a possible obstruction." And in the *Craig* case, after commenting on the fact that no cause was pending before the court, he said, p. 281: "Suppose the petitioner falsely and unjustly charged the judge with having excluded him from knowledge of the facts, how can it be pretended that the charge obstructed the administration of justice. . . ." Complete agreement with the dissents, in these cases neither requires the Court's decision here nor lends it any support.

I do not understand my brethren to maintain that the secret bribery or intimidation of a witness in the court room may not be summarily punished. Cf. *Savin, supra; Sinclair, supra*. If so, it is only because of the effect of the contemptuous act in obstructing justice, which is precisely the same if the bribery or intimidation took place outside the court house. If it may be so punished I can hardly believe that Congress, by use of the phrase "so near thereto," intended to lay down a different rule if the contemptuous acts took place across the corridor, the street, in another block, or a mile away.

If the point were more doubtful than it seems to me, I should still think that we should leave undisturbed a construction of the statute so long applied and not hitherto doubted in this Court. We recently declined to

consider the contention that the Sherman Act can never apply to a labor union, because of long standing decisions of this Court to the contrary, a construction which Congress had not seen fit to change. See *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 487, 488.

In view of our earlier decisions and of the serious consequences to the administration of justice if courts are powerless to stop, summarily, obstructions like the present, I think the responsibility of departing from the long accepted construction of this statute should be left to the legislative branch of the Government, to which it rightfully belongs.

The CHIEF JUSTICE and MR. JUSTICE ROBERTS concur in this opinion.