**In re Application OF THE UNITED STATES FOR MATERIAL WITNESS WARRANT, Pursuant to 18 U.S.C. § 3144, for Material Witness No. 38.**

**No. 01 MISC. 1750(JSR).**

United States District Court, S.D. New York.

Aug. 5, 2002.

Edward O'Callaghan, New York City, for Government.

Robert Dunn, New York City, for Defendant.

## OPINION AND ORDER

RAKOFF, District Judge.

The issue here presented concerns the extent of the Court's authority to inquire into the circumstances that led, seemingly unwittingly, to the Government's making material misrepresentations to the Court. Originally, the proceedings that generated the issue were placed under seal as ancillary to a grand jury investigation. Subsequently, however, most of the matters that otherwise qualified for sealing were disclosed to the public, first by the Government in connection with two criminal cases[1] and then in statements relating to those cases made to the press by the Government and by the other party to the instant proceedings, a prospective grand jury witness named Abdallah Higazy, who was also the subject of one of the two criminal cases.[2] Thus, a subordinate issue

---

1. *See United States v. Abdallah Higazy*, 02 Mag. 53(FM); *United States v. Ronald Ferry*, 02 Cr. 221(GBD).

2. *See, e.g.*, Christine Haughney, *Egyptian Man Charged in New York; Student Accused of Lying About Aviation Radio*, WASH. POST, Jan. 12, 2002, at A13; John J. Goldman, *Response to Terror; Egyptian Accused of Lying to FBI*, L.A. TIMES, Jan. 12, 2002, at A7; Jane Fritsch, *A Nation Challenged: The Investigation; Grateful Egyptian is Freed as U.S. Terror Case Fizzles*, N.Y. TIMES, Jan. 18, 2002, at A3; Christine Haughney, *A Sept. 11 Casualty: "Radio Man" Jailed For A Month, Then Freed; Egyptian Student Perplexed By Mistaken Arrest*, WASH. POST, March 11, 2002, at A3; Ben Weiser, *A Worker is Sentenced for Lie that*

here is whether anything regarding these proceedings should remain sealed.

To the extent not subject to sealing, *see infra*, the facts of this unfortunate matter are as follows. On December 18, 2001, the Court, sitting in the Miscellaneous Part, conducted a hearing as to whether Abdallah Higazy should be detained as a material witness in order to guarantee his appearance before a grand jury investigating the horrendous events of September 11, 2001. The Government alleged, and the witness, an Egyptian national, did not deny, that he had entered the United States on August 27, 2001 on a student visa and had checked into Room 5101 of the Millennium Hilton Hotel, directly across the street from the World Trade Center. The witness was still there when, on September 11, 2001, he, along with all hotel guests, was evacuated soon after the terrorist airplane attacks that morning. Some weeks thereafter, however, a hotel security guard, Ronald Ferry, who was helping conduct an inventory of the still closed hotel, told agents of the Federal Bureau of Investigation ("FBI") that he had found in the room safe provided for valuables in Room 5101, along with Mr. Higazy's passport and a copy of the Koran, a kind of hand-held radio known as a "transceiver" that can be used for air-to-air and air-to-ground communication with persons in possession of a similar radio.

As a result, when Mr. Higazy returned to the hotel to recover his belongings on December 17, 2001, he was questioned and detained by the FBI. Although the witness denied that the transceiver was his, he did, in further questioning, admit familiarity with such devices and eventually admitted that he had previously served in the Egyptian Air Corps. The Government then petitioned this Court to hold Mr. Higazy without bail as a material witness to the grand jury pursuant to 18 U.S.C. § 3144.[3]

At the December 18 hearing on this issue, Higazy denied any impropriety and asked that he be given a polygraph test to prove that the transceiver was not his. Transcript, December 18, 2001 at 27. While the Court declined Higazy's request that it order the Government to give the witness a polygraph test (both because the Court lacked power to do so and because numerous studies indicate that polygraph tests are unreliable, *id.* at 28; *see also* Transcript, March 18, 2002, at 20), the Court indicated that it had no objection to the Government's accommodating Mr. Higazy's request. *Id.* Meanwhile, however, the Government argued that the fact that the transceiver had been found, not just in the room last occupied by Higazy, but in the room safe together with Higazy's passport, showed that the transceiver was Higazy's and that his denial thereof was false and further proof that he should be detained without bail. *Id.* at 34–35. The Court, although finding that this was "not perhaps the most overwhelming showing on the part of the Government," *id.* at 41, concluded that it was sufficient, together with all the other circumstances,[4] to detain

---

*Jailed Egyptian Student*, N.Y. TIMES, May 31, 2002, at B4. *See generally, Butterworth v. Smith*, 494 U.S. 624, 634, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990)(no obligation of secrecy imposed on federal grand jury witnesses with respect to their own identity or testimony).

**3.** Although two judges of this District have subsequently disagreed as to whether § 3144 applies to grand jury proceedings, *compare United States v. Awadallah*, 202 F.Supp.2d 55

(S.D.N.Y.2002) *with In re Application of the United States for a Material Witness Warrant*, 213 F.Supp.2d 287 (S.D.N.Y.2002), Higazy at no time challenged its applicability in his case.

**4.** The Government also relied, *inter alia*, on information about a hypothesized link between the witness and the subject matter of the grand jury's investigation set forth in an affidavit from an F.B.I. agent dated December

the witness for up to ten days for the purpose of securing his appearance before the grand jury during that time period. *Id.* at 38, 40–41.

Ten days later, on December 28, 2001, the parties reappeared before the Court on the Government's application to detain the witness for another ten days to two weeks, the grand jury having not yet heard from him. Although defense counsel initially indicated his consent to the continued detention, Transcript, December 28, 2001 at 2–3, the Court, in fulfillment of its obligation not to detain someone without an adequate basis to do so, required the parties to provide further information. *Id.* at 10. The Government then informed the Court that, in response to the witness's prior request, the FBI had arranged for the witness to be given a polygraph test on December 27, 2001, during the course of which the witness had confessed that the transceiver was his, though providing three different versions of where it came from. *Id.* at 10–11. The witness's reported confession, the Court concluded, made the decision to detain the witness "no longer ... even an arguably close call," *id.* at 12, and consequently, the Court ruled, the witness could be held without bail until January 14, 2002 in order that this testimony could be taken by the grand jury. *Id.* at 13–14.

In the end, however, the witness was never presented to the grand jury. Rather, after re-interviewing the hotel security guard, the Government, on January 11, 2002, formally charged Higazy with making material false statements to the Government by initially denying possession of the transceiver. *See* Complaint, *United States v. Abdallah Higazy,* 02 Mag. 53(FM). Accordingly, on January 14, 2002, the material witness warrant was vacated and Higazy was detained by order of Magistrate Judge Maas pursuant to the criminal complaint. *See* Transcript, January 14, 2002, at 6.

Later that same day, however, an American pilot who had also been evacuated from the Millenium Hilton Hotel on September 11, 2001 arrived at the hotel to retrieve his belongings and, after inspecting the items that were handed to him, advised the hotel employees that he had also had a transceiver. Further investigation by the FBI quickly confirmed that the transceiver previously attributed to Higazy actually belonged to the pilot, who had no connection to Higazy. Still further investigation revealed that the hotel security guard had repeatedly lied to the FBI in stating that he had found the transceiver in the safe in Higazy's room. *See* Government Letter to Magistrate Judge Maas, January 16, 2002. Based on these developments, the Government promptly dismissed the charge against Higazy, *see id.* (order endorsed, 1/16/02).

Upon learning of these developments, this Court, on January 18, 2002, convened, *sua sponte,* a telephonic (but transcribed) conference with counsel to raise its concern that the Government might have made material misrepresentations to the Court, both at the December 18 hearing when the Government represented that the transceiver was found in a safe in Higazy's room and at the December 28 hearing when the Government represented that Higazy had confessed to possessing the transceiver. Transcript, January 18, 2002, at 2–3. The Court requested letter-briefing on these concerns, *id.* at 15, with particular reference to whether, as Higazy's counsel argued, the Court had authority and a basis in these circumstances either to initiate contempt proceedings or, short of that, to undertake a factual inqui-

18, 2001, at least portions of which may re- main under seal, *see infra.*

ry premised on the Court's inherent supervisory powers. Subsequently, an oral argument on these issues was scheduled for March 18, 2002.

In the interim, the Government charged the hotel security guard, Ronald Ferry, with making false statements, see *United States v. Ronald Ferry*, 02 Cr. 221(GBD), and on February 27, 2002 Ferry pled guilty. This effectively obviated the need for the Court to pursue further the issue of the material misrepresentations made to the Court at the initial hearing on December 18, 2001, since it was now clear that those misrepresentations, regarding the location of the transceiver, were the fault, not of the Government, but of the hotel security guard, whom the Government had now taken appropriate steps to punish.

The argument on March 18, 2002 therefore focused on the Government's representation at the hearing on December 28, 2001 that Higazy had "confessed" to possessing the transceiver. Transcript, March 18, 2002, at 7–8. While conceding that "the government is terribly troubled by how this case unfolded," *id.* at 10, Government counsel argued that no misrepresentation had been made to the Court because, for whatever reason, Higazy had in fact told the FBI agent conducting the polygraph test on December 27 that the transceiver was his (Higazy's). *Id.* at 24. Thus, even though that now appeared to be a false confession, the Government, not knowing this at the time, properly brought the confession to the Court's attention on December 28. *Id.* at 45–46.

In response, Higazy's counsel did not deny that Higazy might have made the statement to the FBI polygraph examiner attributed to him, see *id.* at 45–46, 51, –52, but argued that, in light of Higazy's prior strenuous denials of possessing the transceiver and the now established truth of those denials, the circumstances under which the "confession" was made were inherently suspicious and required factual inquiry by the Court. *Id.* at 46, 51–52. At a minimum, Higazy's counsel argued, the Government had acted improperly in obtaining an uncounseled confession. Specifically, Higazy, after being informed that it was standard FBI procedure to conduct polygraph tests outside the presence of counsel, agreed to have his counsel wait outside the polygraph testing room while the test proceeded, *id.* at 16, 46; but at some point, the FBI agent ceased administering the test, and instead, began a conversation with the witness leading to the "confession." While it might be true, as the Government argued, that Higazy had been told that he could stop the testing at any point and consult with his attorney, *id.* at 19, this did not mean, argued Higazy's counsel, that the Government had the right to take advantage of the happenstance of an interruption in the polygraph testing to begin an interrogation leading to an uncounseled confession. *Id.* at 46–47.

Going further, Higazy's counsel alleged in his papers that his client had reported afterwards that the FBI agent had threatened Higazy's family's safety if Higazy did not confess, see Letter–Brief of Higazy's Counsel dated January 28, 2002, at 2; see *also* Transcript, January 18, 2002, at 7–8. While the Government denied these allegations, see Transcript, March 18, at 15–16, Higazy's counsel argued that this only meant that there was a factual dispute and that the Court should conduct an evidentiary hearing (just as a court would conduct a suppression hearing if the criminal case against Higazy were still ongoing). See *id.* at 44–45.

The Government, however, argued that, unlike the situation where the Court would be obliged to hold a suppression hearing because it would have to determine the admissibility *vel non* of evidence sought to

be introduced at trial, here there was no trial nor, indeed, any remaining charge against the witness whatever, and consequently there was no reason or basis for the Court to pursue the matter further. Specifically, the Government argued, there had neither been a contempt nor, at this stage, any other basis for the Court to exercise any further jurisdiction over the matter. *Id.* at 26–38. While Higazy's counsel argued that this was tantamount to saying that there was no penalty for the Government's having used a putatively improperly-obtained confession to induce the Court to keep Higazy in jail, *id.* at 44, the Government advised that it was conducting its own internal review of the polygraph examiner's conduct and would keep the Court apprised of its progress—an offer the Government formally and unconditionally reconfirmed the next day. *See* Government Letter, March 19, 2002.

In light of this offer, the Court deferred ruling on the issues joined at the March 18, 2002, pending the results of the Government's internal investigation. When nothing further was heard from the Government, the Court requested an update, which was received in letter form on June 28, 2002. While that letter (which will remain under seal, *see infra*) indicated that the Government had taken a number of appropriate steps to investigate the matter, it also recited that the investigation was not yet complete and the results not yet apparent. Moreover, in seeming departure from its earlier, unconditional assurances to the Court, the Government added that it would refrain from going further with the investigation until the Court decided whether or not it was going to conduct its own evidentiary hearing on the matter.

While the Court rejects this attempt by the Government to add an after-the-fact qualification to the unqualified assurances the Government gave the Court in its letter of March 19, 2002—assurances to which the Government will be held—the Court agrees that the matters argued before the Court on March 18 are ripe for decision. Indeed, the Court would have issued its opinion several weeks ago, except for still further briefing occasioned by a letter from the New York Times, dated July 12, 2002, requesting unsealing of all letters, documents, and transcripts relating to this matter. *See* discussion *infra*. But with the record now complete, the Court hereby rules as follows:

■ *First*, as to the issue of contempt, the Court is in agreement with the Government that the alleged misconduct of the polygraph examiner that precipitated the false confession reported to the Court on December 28 does not fall within this Court's criminal contempt jurisdiction.[5] That power is codified in 18 U.S.C. § 401, which reads as follows:

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

*Workers of America v. Bagwell,* 512 U.S. 821, 840, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (Scalia, J., concurring); *Nye v. United States,* 313 U.S. 33, 42, 61 S.Ct. 810, 85 L.Ed. 1172 (1941).

---

5. Any contempt in this case is criminal, rather than civil, as the contempt sanction contemplated would not serve to compel further compliance, but rather to punish previous misconduct. *See Int'l Union, United Mine*

The parties are agreed that the portion of § 401 here applicable, if any, is the provision of subsection (1) relating to "[m]isbehavior ... so near [to the court] as to obstruct the administration of justice." Under an old but still viable Supreme Court precedent, *Nye v. United States*, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941) the words " 'so near' ... are to be construed as geographical terms." *Id.* at 48, 61 S.Ct. 810. But that statement by itself does not resolve the issue here, for the polygraph test, as it happens, was administered in an office on the 5th Floor of the same courthouse in which this Court sits, arguably close enough to meet the *Nye* standard.

All three subsections of § 401, however, are intended to specify forms of "contempt of [the Court's] authority," as set forth in the prefatory language of § 401. To be criminal, moreover, the contempt must be intentional. Here, it is plain, even on the present record, that the alleged "misbehavior" of the FBI agent was not directed at the Court or its authority. This is not a situation where a Government agent makes a false statement to his lawyer, intending that the lawyer repeat it in court and thereby mislead the Court—although even in that case the courts appear divided as to whether § 401(1) has been violated. *Compare O'Malley v. United States*, 128 F.2d 676 (8th Cir.1942)(reversed on other grounds)(holding that such conduct constitutes contempt) *with Calvaresi v. United States*, 216 F.2d 891, 905 (10th Cir.1954)(reversed on other grounds)(holding that it does not). Rather, the alleged misbehavior here consists, worst case, of an FBI agent's taking unfair advantage of a situation created during a polygraph testing expressly requested by the witness to obtain from the witness a coerced or uncounseled confession that could be used to bring criminal charges against the witness. Nothing in this situation remotely suggests that the FBI agent, even if guilty of such coercion, intended thereby to mislead the Court in connection with the only upcoming proceeding then contemplated before this Court: a then-uncontested application to extend the witness's detention as a material witness for an additional ten days to two weeks. Accordingly, there is no basis for proceeding here further on a theory of criminal contempt.

*Second*, however, the fact that there was no contempt does not mean that the false confession obtained from Higazy did not materially impact the Court's processes for, as previously discussed, the Court was not willing to simply go-along with the uncontested request for a further detention of Higazy but, instead, demanded further information regarding what had previously seemed a close call, and in the process was materially misled by being informed of a confession that subsequently was shown to be false. Assuming *arguendo* that the obtaining of such confession was the product of Governmental misconduct, is there no judicial remedy for the Court's having been misled as the result of such misconduct? Does oversight of such misconduct that directly impacts the Court not fall within the Court's general supervisory power, which "serves the 'twofold purpose of deterring illegality and protecting judicial integrity' "? *United States v. Payner*, 447 U.S. 727, 735 n. 8, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980); *see United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

■ The breadth and flexibility of a court's general supervisory power are illustrated by the fact that it is pursuant to its supervisory power that the Supreme Court has sometimes excluded impermissibly obtained evidence, *see, e.g., McNabb v. United States*, 318 U.S. 332, 340–41, 63 S.Ct. 608, 87 L.Ed. 819 (1943), and has

made clear that the federal courts may, in certain circumstances, dismiss impermissibly obtained indictments, *see, e.g., United States v. Williams,* 504 U.S. 36, 46, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (*citing Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)). To be sure, in such cases, as previously noted, there is still an ongoing underlying proceeding before the Court and the supervisory power is exercised to keep the judicial processes free from future taint (*i.e.,* to prevent the introduction of improperly obtained evidence or to prevent the trial of an improperly obtained charge), whereas here the damage has already been done (by the witness being detained after December 28) and the immediate matter is at an end (by the witness thereafter being released and exonerated). It would be odd, however, if misconduct that materially impacted the Court were shielded from any inquiry simply because the case were otherwise over.

Nor does it suffice that the witness may possibly have civil remedies available to him for the harm inflicted by the alleged misconduct (although governmental immunities may limit such redress). The victim we are here concerned with is not the witness, but the Court, which was materially misled. A wrong that so directly impacts the judicial process should not be wholly beyond the Court's power to address.

On the other hand, the exercise of such authority in such circumstances should be very limited and circumspect, for a court sits chiefly to decide controversies, not to oversee the conduct of the parties. Nor is it prudent for a court to act as both prosecutor and jury except in extreme circumstances, such as in the case of a contempt occurring in the actual presence of the Court.

Balancing all these considerations, in a situation largely unprecedented, the Court concludes that, while it retains some modest authority, pursuant to its general supervisory power, to inquire into the circumstances that led to the Court's being materially misled, that authority is limited to ordering an investigation and, where appropriate, to publicizing the results, so as to make known the truth and deter future misconduct. Barring highly unusual circumstances, moreover, a court should look to the Government to conduct the investigation of the alleged misconduct, for such investigations fall naturally within the Government's ordinary area of expertise, and while there may be some difficulty in the Government's investigating its own agent, by that very relationship the Government is often in a much better position to ferret out the facts than would be the Court. Moreover, despite the Court's disappointment with the Government's recent waffling about promptly completing its investigation, the overall·manner in which the Government has conducted itself throughout this difficult case gives the Court some confidence that the investigation will be conducted properly.

In short, what the Government has already volunteered, the Court here orders, with the difference that it will ultimately be for the Court, not the Government, to determine what public record to make, if any, of the results. Specifically,·the Government is directed to complete its investigation and report the results to the Court, *ex parte* but in writing, by no later than October 31, 2002. Whether, at that point, the results should be disclosed to the public is an issue best left until that date.

 *Third,* there remains the request of Mr. Higazy's counsel, joined in by the *New York Times,* to unseal all prior papers and proceedings in this case. While grand jury secrecy is mandated by law, *see*

Fed.R.Crim.P. 6(e)(5) & (6), the determination to jail a person pending his appearance before a grand jury is presumptively public, for no free society can long tolerate secret arrests. *See, e.g., Morrow v. District of Columbia,* 417 F.2d 728, 741–742 (D.C.Cir.1969) ("The requirement that arrest books be open to the public is to prevent any 'secret arrests,' a concept odious to a democratic society."); *Center For National Security Studies v. United States Department of Justice,* 215 F.Supp.2d 94, 98 (D.D.C.2002); (Kessler, J.) (same). Where the two doctrines collide, the broad interpretation otherwise often appropriate of what is "ancillary" to the grand jury proceedings must give way to the public's right to know and assess why someone is being jailed, with the result that sealing of matters relating to the arrest and detention must be limited to keeping secret only what is strictly necessary to prevent disclosure of what is occurring before the grand jury itself. *See* Fed.R.Crim.P. 6(e)(5)("the court shall order a hearing on matters affecting a grand jury proceeding to be closed to the extent *necessary* to prevent disclosure of matters occurring before the grand jury"); Fed. R.Crim.P. 6(e)(6)("Records, orders and subpoenas relating to grand jury proceedings shall be kept under seal to the extent and for such time as is *necessary* to prevent disclosure of matters occurring before the grand jury.")(emphases supplied).

Here, moreover, the argument for continued sealing is largely academic, not only because Higazy never was presented to the grand jury but also because the Government, in its public filings regarding the charging and discharging of Higazy and the charging, convicting, and sentencing of

Ferry, publicly disclosed virtually all the facts here at issue that could conceivably be claimed to relate to matters occurring before the grand jury. For example, the circumstances that led to Higazy's initial detention, his various statements to the FBI (notably including his statements to the polygraph examiner, which were repeated in open court by the prosecutor at that time Higazy was criminally charged and then widely reported in the press [6]), the circumstances leading to Higazy's subsequent exoneration, the conflicting statements made by Ferry and other hotel employees, and much more, are all set forth in the Government's public filings and in its public statements, not to mention the public statements of Higazy and his counsel regarding Higazy's own knowledge of the facts. *See, e.g.,* footnotes 1 and 2, *supra.* As for the conduct of the polygraph examiner, Higazy, as a participant in the event, has never been under any impediment to making public his version of what occurred. Moreover, not even the Government suggests that the manner in which the polygraph examiner conducted the voluntary testing that Higazy himself initiated is itself the subject of a grand jury proceeding. Finally, of course, much of the in-court proceedings and the great bulk of the written submissions in this matter deal with purely legal issues that do not remotely reveal any aspect of the grand jury's investigation.

Grand jury secrecy, therefore, remains implicated here only to the extent, if any, that matters that directly relate to the grand jury's investigation and that have not subsequently and lawfully been made public are referred to in the papers or proceedings previously sealed in this case. The Court has reviewed the file and finds

---

**6.** *See, e.g.,* Goldman, *supra* note 2, at A7 ("Assistant U.S. Atty. Dan Himmelfarb told the judge Friday that Higazy agreed during a third interview that the radio belonged to him but told three conflicting stories about how he got it.").

nothing in the transcripts or in the written submissions of Higazy's counsel that qualifies under these standards for continued sealing. Nor does it appear that the greater part of the Government's written submissions qualify for continued sealing. Nevertheless, there may be a few statements, such as in the FBI affidavit presented to the Court in connection with Higazy's initial detention, *see* footnote 4, *supra*, that remain entitled to sealing pursuant to grand jury secrecy. Rather than making those determinations now, therefore, the Court, in an excess of caution and before permitting the unsealing of any part of the file, will give the Government until 5 p.m. on August 9, 2002 to submit to the Court proposed redacted versions of any of the papers herein (including transcripts and written submissions of any party) showing the redactions that the Government believes are still justified under the standards enunciated herein—following receipt of which the Court will promptly make the final determinations as to unsealing.

Grand jury secrecy aside, there is one document that must continue to be sealed, at least for now, and that is the Government's June 28 letter to the Court reporting the Government's preliminary results of its inquiry into the conduct of the polygraph examiner. This, and all further reports relating to that subject matter, will remain sealed pending further order, not because of grand jury secrecy (to which, as mentioned, they do not relate), but rather to protect the integrity of the ongoing internal investigation here ordered by the Court.

SO ORDERED.